# PETER J. ABADIE



Attorney-at-Law

July 10, 2021

Honorable Jay C. Zainey
U.S. District Court, Eastern District of Louisiana
500 Poydras Street
New Orleans, LA 70130

Re:    U.S. v. Irvin Mayfield, Jr.

Dear Judge Zainey:

Over a year ago, I was introduced to Irvin Mayfield, Jr. and since that time have had an ongoing friendship with him. On numerous occasions I have observed his demeanor with other people and his willingness to accommodate them. Unquestionably, his musical talents are incredible. However, the exploitation of those same talents let him into his present trouble, as he grossly overestimated his responsibilities to the library board.

I have spoken to Irvin about his guilty plea and his impending sentence, whereby Your Honor will be judging his behavior for actions he took in the alleged misappropriations of New Orleans Library funds. Obviously, I have minimal knowledge of what laws he violated, except for what I have read on the internet and what he has personally told me.

The man I have come to know is certainly no threat to others in any way; either physically or financially. I am recommending Irvin Mayfield, Jr. for leniency, as one who deserves a second chance at life. Certainly not because he is my friend, but because his behavior since committing his crime has earned him a second chance. His good reputation in the national music community has almost been erased by his actions. My understanding is that he has pledged to pay over four hundred thousand dollars in retribution. Incarceration, while well-deserved for some, was not designed for him. Irvin has more than paid his debt to society and he should be allowed to remain free to continue the good work I have observed him doing.

Very truly yours,

Peter J. Abadie

# Tania Tetlow

August 24, 2021

Judge Jay Zainey
Federal District Courthouse
500 Poydras Street
Room C455
New Orleans, Louisiana 70130

Dear Judge Zainey,

I write, in my personal capacity, about the sentencing of Irvin Mayfield and Ron Markham.

I was chair of the New Orleans public library board when Katrina hit. I'll never forget climbing into the windows of branches and seeing books reduced to floating piles of mulch, or begging the national guard to board up blown-out windows to protect what was left.

Given the enormity of destruction, board members asked ourselves whether libraries needed to wait on far more pressing needs. But we quickly realized that New Orleanians needed internet, computers and librarian help to fill out complicated FEMA and insurance forms. New Orleans needed community spaces with air conditioning and electricity, places for children to gather while schools were closed.

In 2005, the Library Foundation (which then had overlapping boards – I was part of both) maintained an endowment of about $3 million, the result of many, primarily small, donations from generations of locals who loved our work dearly. The Foundation treated that fund as a proper endowment, never touching the corpus and using the interest to supplement a severely restricted city budget. For years, the endowment entirely funded the purchase of all new books for the library system, because the city's budget covered only staff and other operating expenses.

After Katrina, we made the careful decision to hire a single development staffer. We had been so cautious for decades, this was a reach for us, but we hoped we could capture some of the overwhelming national concern for the region in order to help the libraries.

We spent the next year furiously fundraising. From kids running lemonade stands and donating hundreds of dollars in small change, to the Gates and Clinton Bush Foundations and their millions, we started a small movement, ultimately raising about $7 million dollars. Most of it was for current use – to rebuild libraries --- and some of it went directly to the City for that purpose. But we were also able to increase the corpus of the endowment to $3.9 million.

The national support was overwhelming. In fact, some well-meaning soul started an email campaign asking Americans to mail the library used books. It was a heartwarming disaster, until we finally figured out how to ship truckloads of tattered paperbacks to an online second-hand dealer who sold them for us and sent back the proceeds.

That June of 2006, the very first convention returned to New Orleans with the American Library Association. Convention-goers helped put the finishing touches on our two smallest branches, reopening the Children's Resource Center and the Alvar branch in Bywater. I'm pretty sure those were the first two city government buildings to reopen after the storm.

I won't reiterate the facts contained in the indictment or factual bases, but as you know, now, it's almost all gone. The library foundation endowment has been reduced to $1.3 million, less than half of where it started before Katrina. Public trust in the Foundation has been deeply damaged, making fundraising difficult for years to come.

I write to attest that the money raised for the library was meant for the library, not for any other unrelated nonprofit, and certainly not for hotel bills at the Ritz.

The money raised, and stolen, embodied the public's faith in libraries as institutions that matter. Libraries represent opportunity – ever more so as the digital divide widens. Libraries are often the only access to the internet and technology for the poorest members of our community. (And COVID gave us all another crash course in how much that access matters.) Libraries are safe places for children to come and embrace learning. They are places of literacy training, community meetings, and lifelong learning.

If stealing from libraries does not merit real punishment, I'm not sure what does.

It is exceedingly rare that complicated financial crimes get caught because it requires such an investment of resources to untangle. Those who commit those crimes know that the chances of being discovered are slim, that penalties are slight, and that judges tend to see the humanity in educated and sophisticated defendants.

Judge, I know that you are a deeply forgiving person, and I am not writing to ask you to sit in judgment on these two men. I am asking you to affirm to the community that crimes committed against them matter. That stealing from libraries isn't something rewarded with a slap on the wrist.

I am asking you to make clear that you do not condone the theft of money raised by countless members of this community to support an institution that matters so much to them, and to their opportunities in life.

All my best,

Tania Tetlow

Hannah S. Cail



January 18, 2021

Honorable Jay C. Zainey
c/o Dall Kammer
Eastern District of Louisiana
650 Poydras Street, Suite 1600
New Orleans, LA 70130

   RE: Case 2:17-cr-002410JCZ-JVM, *United States v. Irvin Mayfield*

Dear Hon. Zainey:

I felt a wave of relief and vindication when I learned of Irvin Mayfield's indictment more than three years ago. I cried at my desk overwhelmed knowing that my mother was a victim of Mayfield's avaricious aspirations, albeit at the beginning of his conspiracy to ultimately defraud the New Orleans Public Library Foundation out of more than $1.3 million. My mother, Donna Schremser, served as the Director of the New Orleans Public Library (NOPL) from 2007 through 2008. Mayfield, as Board Chair, cut my mother's tenure short and devasted her exceptional career. At the time, we suspected it was because she pushed back against his questionable behavior. Now I know Mayfield sought my mother's resignation because he understood she was adept and would stand in his way to stealing funds intended to support an institution and community for which she cared so deeply.

Following a NOPL fundraiser when my mother was Director, Mayfield presented her a check to sign for $60,000. She refused, much to Mayfield's dismay, because the New Orleans Jazz Orchestra volunteered to perform and no compensation was ever discussed or contemplated for their performance. She expressed suspicion of the check, questioned where Mayfield got the check, and notified him that she lacked authority to sign any check because the City controls NOPL's bank account. After that incident, my mother feared retaliation by Mayfield and for her own safety. She also felt alone and undermined by Mayfield from the outset, and therefore unsure whom to trust or disclose the check incident.

Shortly after my mother started, Mayfield and Rica Trigs, the deputy library administrator at the time and Mayfield's confidant, charted a path that ultimately enabled Mayfield access to Foundation funds with no honorable oversight. He and Trigs hired a consultant to restructure the NOPL Administration without my mother's knowledge—without the Library Director's knowledge—let alone her approval. The plan provided for a division of the existing Director's duties, which the City Charter outlines, and delegated important administrative duties to the newly

*United States v. Irvin Mayfield et al*
January 18, 2021
Page 2 of 3

created Chief Operating Officer position. Notably, the City Charter requires the Library Director to have a master's in library science. Trigs lacks a master's in library science, which is why she could not lawfully be the Library Director. Following the plan implementation, Mayfield appointed Trigs as the new COO, wherein Trigs received a salary that exceeded that of the lawful Director.

After my mother's resignation, Mayfield and Trigs refused to pay her wages owed or payout her retirement. My mother had to resort to civil action to recover her past due wages, which now I suspect was an attempt by Mayfield and Trigs to distract from Mayfield and Trigs own unethical behavior. In 2011, the Louisiana Board of Ethics found Trigs violated Section 1117 of the Code of Governmental Ethics when she supplemented her NOPL salary with funds from the Library Foundation.

My mother served as the Huntsville-Madison County Public Library Director, in Huntsville, Alabama, for twenty-five years. When my mother announced she accepted the NOPL directorship in 2007, the Huntsville Times referred to my mother as "one of the city's cultural icons," responsible for transforming the library into a revered institution and leading it to its preeminent place in the nation at the top of per capita patronage rankings. Her career did not fully recover from being so callously dismissed in New Orleans. And her health suffered. In 2012, my mother was diagnosed with Early On-set Alzheimer's Disease. Research shows that stress increases the risk and exacerbates Alzheimer's Disease, and I cannot help but believe her heartbreaking experience in New Orleans contributed to her Alzheimer's Disease. My mother passed away on November 7, 2020, just three days before Mayfield pleaded guilty to defrauding the Library Foundation out of over $1.3 million.

Under 18 U.S.C. § 3553(a), the Court shall consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed:
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B) to afford adequate deterrence to criminal conduct;
>> (C) to protect the public from further crimes of the defendant;
>>                        . . .
> (7) the need to provide restitution to any victims of the offense.

I strongly urge the Court to impose the U.S. Attorney's recommended 7-year sentence and restitution, which accounts for Mayfield's duplicitous character and reflects the seriousness of his offense, promotes respect for the law, and provides just punishment. My mother's experiences reinforce the evidence before the Court regarding the nature and circumstances of Mayfield offense as protracted, deliberate, and tactful. Mayfield's offense was not one transgression or a simple crime of opportunity but a strategic, multifaceted conspiracy. Mayfield did not simply embezzle

*United States v. Irvin Mayfield et al*
January 18, 2021
Page 3 of 3

or defraud his own nonprofit by paying himself an exorbitant salary or buying ridiculous gold trumpets or lavish hotel stays.

Mayfield plotted for years to position himself in a place of power with no bona fide oversight. His history evidences a long, well-planned conspiracy where he restructured the Library administration, removed from power astute leadership, and strategically placed in positions of power his allies, abettors, and co-conspirators. He rewrote the rules that applied to him to enable himself to transfer funds from the Library Foundation to his own illegitimate nonprofit.

Mayfield sought positions of public trust of which Mayfield took advantage to steal from an institution integral to supporting the less fortunate members of the community. How many computers could that $1.3 million buy? Or books? Every cent Mayfield stole for his own indulgence adversely affects the community members that rely on the Library resources.

Mayfield's conduct warrants every day of that seven years because of how perfidious and calculating his conspiracy was and how many lives he devastated with complete disregard.

With great appreciation,

Hannah S. Cail



**NEW ORLEANS**
P U B L I C   L I B R A R Y
F O U N D A T I O N

February 1, 2021

***Via Fed-Ex:***
Assistant U.S. Attorney
G. Dall Kammer
Deputy Chief of the Fraud Unit
United States Attorney's Office
Eastern District of Louisiana
650 Poydras Street, Suite 1600
New Orleans, LA 70130

<div style="margin-left:40%;">

Re:     Victim Impact Statement of
        The New Orleans Public Library Foundation
        *USA v. Irvin Mayfield; Ronald Markham*
        Criminal Action 17-241       Sect. "A"

</div>

Dear Mr. Kammer:

I write to you on behalf of the New Orleans Public Library Foundation ("NOPLF") and hope that you will consider this statement of the impact that the illegal actions of Irvin Mayfield ("Mayfield") and Ronald Markham ("Markham") have occasioned to the NOPLF.

By way of background, the NOPLF was instituted in 1990 to support the New Orleans Library System and the New Orleans Library Board (collectively, the "Library") by managing gifts made by private individuals, companies, and foundations. It is an educational, charitable non-profit organization, which is organized under IRS Section 501(c)3. The NOPLF is guided by its Board of Directors, who serve on a volunteer basis.

From the time of its establishment in 1990 until the devastation wrought by Hurricane Katrina in 2005, the NOPLF effectively managed gifts and bequests made in support of the Library. The NOPLF maintains an investment account to further its support of the Library. Prior to 2005, the NOPLF primarily utilized income from the investment of such gifts and bequests to support the acquisition of books, but, in the aftermath of Katrina, the NOPLF, along



**NEW ORLEANS**
**PUBLIC LIBRARY**
**FOUNDATION**

with the Library's Board of Directors and other stakeholders, faced the challenge of reviving ruined libraries.

In August of 2006, Mayfield joined the NOPLF Board of Directors. Markham likewise joined the NOPLF Board of Directors in December of 2009. Subsequently, in November of 2010, Mayfield assumed the role of President of the NOPLF. Mayfield then resigned from the office in September of 2013, whereby Markham succeeded him as NOPLF President.

Prior to and during their affiliation with NOPLF, Mayfield and Markham were involved with the New Orleans Jazz Orchestra, which Mayfield had founded in 2002. While Mayfield served as NOJO's Artistic Director and featured performer, Markham served as NOJO's President and Chief Executive Officer. We later learned that Mayfield and Markham each received annual salaries of approximately $100,000 for their respective roles with the NOJO. Each additionally obtained related income from Mayfield Production Company, and Mayfield Publishing Company.

After Hurricane Katrina, Mayfield raised considerable funds for the Library based on his reputation as a Grammy-winning trumpeter. However, Mayfield and Markham simultaneously used their platforms with the NOPLF for unlawful personal gain. Between August 25, 2009 and November 18, 2013, Mayfield and Markham unlawfully transferred and caused to be transferred a total of $1,316,232 from the NOPLF investment account to the NOJO.

Through their positions with the NOJO, Mayfield and Markham wrongfully received substantial financial compensation resulting from these transfers, which they themselves authorized. An illustrative listing of Mayfield and Markham's illicit fund transfers from the NOPLF to the NOJO is set forth in Exhibit "A" attached hereto. One of the more egregious items concerns the transfer of approximately $15,000 from a Youth Rescue Initiative account to purchase a 24-karat gold-plated trumpet for Mayfield from a trumpet manufacturer.

The $1,316,232 in illegitimate fund transfers from the NOPLF to the NOJO represents a substantial diversion of NOPLF resources—resources that were intended to be used for the direct support of the Library. As a result of this impermissible deviation of its funds, the NOPLF has suffered both directly and indirectly. Due to the tangible $1,316,232 loss, the work of the NOPLF in furtherance of its purpose, the support of the Library, has been significantly impeded. Yet, the intangible impact to the NOPLF has been equally significant, if not more so.

The actions of Mayfield and Markham have had a deleterious effect on the NOPLF and have undermined public confidence in the integrity of the NOPLF, rendering it all but impossible for the NOPLF to engage in fundraising on the Library's behalf. Illustrative of this manifest concern is the necessitation of the cancellation of the YMCA adult literacy program and the book giveaway program. Further, the untoward acts of Mayfield and Markham inordinately



**NEW ORLEANS**
**P U B L I C   L I B R A R Y**
**F O U N D A T I O N**

jeopardized the NOPLF's partnership with the Library, the very entity the NOPLF exists to serve. Although the NOPLF has appreciably rebuilt its partnership with the Library through the efforts of NOPLF Board Members, the work to reestablish this fundamental relationship was only necessitated by Mayfield and Markham's misdeeds.

The NOPLF has sustained financial losses far exceeding those directly attributable to Mayfield and Markham's actions during their tenure with the NOPLF Board of Directors. In addition, the NOPLF has suffered immeasurable corresponding intangible losses. The NOPLF therefore implores that Mayfield and Markham be held accountable for the harm they have caused and seeks restitution of no less than $1,123,032.00 from Mayfield and Markham, as they agreed to pay, pursuant to their plea agreement in the above-referenced criminal matter. Of course, no financial award could completely negate the lasting damage occasioned to the NOPLF and the Library by the actions of Mayfield and Markham, but such an order of restitution would serve as a beneficial step towards repairing the damages sustained.

Yours truly,

New Orleans Public Library Foundation

Members:
Barbara Waiters (President), Katie Williams,
Demetric M. Mercadel, Sally Lindsay, Meb Norton,
and Cleveland Spears, III

Barbara Waiters, For the Foundation



**Exhibit "A"**
**Illustrative Itemization of Unlawful Transfers from**
**NOPLF to NOJO Authorized by Mayfield and Markham**

1. On about August 23, 2011, MAYFIELD and MARKHAM transferred and caused to be transferred $100,000 from NOPLF to NOJO, which was used to pay NOJO operating expenses, $10,000 to Mayfield Production, two payments of $8,333.33 to MAYFIELD for salary, and two payments of $6,032.54 to MARKHAM for salary.

2. On about October 7, 2011, MAYFIELD and MARKHAM transferred and caused to be transferred $25,000 from NOPLF to NOJO, which was used to pay $25,000 into a personal checking account of MAYFIELD.

3. On about October 21,2011, MAYFIELD and MARKHAM emailed and caused to be emailed materially false and misleading financial information to a NOJO board member.

4. On about October 26, 2011, MAYFIELD and MARKHAM transferred and caused to be transferred $ 150,000 from NOPLF to NOJO, which was used to pay NOJO operating expenses, $23,000 to a sculptor, two payments of $8,333.33 to MAYFIELD for salary, and two payments of $6,032.54 to MARKHAM for salary.

5. On about December 29, 2011, MAYFIELD and MARI(HAM transferred and caused to be transferred $100,000 from NOPLF to NOJO, which was used to pay NOJO operating expenses, $5,000 to Mayfield Production, $8,333.33 to MAYFIELD for salary, and $6,032.54 to MARKHAM for salary.

6. On about January 19, 2012, MAYFIELD transferred and caused to be transferred $50,000 from NOPLF to a YRI account for MAYFIELD.



7. On about February 27, 2012, MAYFIELD and MARKHAM transferred and caused to be transferred $100,000 from NOPLF to NOJO, which was used to pay NOJO operating expenses, $7,000 to Mayfield Production, $8,333.33 to MAYFIELD for salary, and $6,053.74 to MARKHAM for salary.

8. On about April 29, 2012, MAYFIELD and MARKHAM transferred and caused to be transferred $50,000 from NOPLF to NOJO, which was used to pay NOJO operating expenses, $8,333.33 to MAYFIELD for salary, and $6,053.29 to MARKHAM for salary.

9. On about May 31, 2012, MAYFIELD and MARKHAM transferred and caused to be transferred $50,000 from NOPLF to NOJO, which was used to pay NOJO operating expenses, $8,333.33 to MAYFIELD for salary, and $6,053.28 to MARKHAM for salary.

10. On about June 19, 2012, MAYFIELD and MARKHAM created and caused to be created materially false and misleading NOJO correspondence, dated August 29, 2011.

11. On about June 19, 2012, MAYFIELD and MARKHAM created and caused to be created materially false and misleading NOJO correspondence, dated October 11, 2011.

12. On about June 19, 2012, MAYFIELD and MARKHAM created and caused to be created a materially false and misleading NOJO invoice, dated February 27, 2012.

13. On about June 19, 2012, MAYFIELD and MARKHAM created and caused to be created a materially false and misleading NOJO invoice, dated May 31, 2012.

14. In about July 2012, MAYFIELD and MARKHAM paid and caused to be paid $13,438.49 from NOPLF to Ritz Carlton New York to pay for MAYFIELD's stay during the course of a NOJO performance.



NEW ORLEANS
PUBLIC LIBRARY
F O U N D A T I O N

15. On about August 27, 2012, MAYFIELD and MARKHAM transferred and caused to be transferred $50,000 from NOPLF to NOJO, which was used to pay NOJO operating expenses.

16. On about September 11, 2012, MAYFIELD and MARKHAM made and caused to be made materially false and misleading representations to auditors, including that $375,000 in NOPLF funds was transferred to NOJO in 2011 as fiscal agent to implement the provisions of Memorandums of Understanding with YRI, University of New Orleans, and the Southern Food and Beverage Museum.

17. On about September 18, 2012, MAYFIELD and MARKHAM transferred and caused to be transferred $16,000 from NOPLF to NOJO, which was used to pay NOJO operating expenses, including 59,728.44 to Park Central Hotel in New York for MAYFIELD's stay during the course of a NOJO performance.

18. On about September 24, 2012, MAYFIELD and MARKHAM transferred and caused to be transferred $50,000 from NOPLF to NOJO, which was used to pay NOJO operating expenses.

19. On about September 27, 2012, MAYFIELD and MARKHAM transferred and caused to be transferred $150,000 from NOPLF to NOJO, which was used to pay NOJO operating expenses, $5,000 to Mayfield Production, $ 13,470.13 to Park Central Hotel in New York, $38,924 to Carnegie Hall, $18,860.71 to The Ritz Carlton in New York, $8,333.33 to MAYFIELD for salary, and $6,053.29 to MARKHAM for salary.

20. On about October 26,2012, MAYFIELD contacted an acquaintance at a third party organization, and asked for the organization to hold approximately $70,000 of NOPLF money in



an organization bank account, telling the acquaintance that he was trying to avoid moving the funds to an organization of which he was a board member.

21. Between about November 1, 2012, and November 5, 2012, MAYFIELD and MARKHAM transferred and caused to be transferred $100,000 from NOPLF to NOJO, and $45,000 of NOPLF funds being held by YRI for MAYFIELD to NOJO, which was used to pay NOJO operating expenses, $25,000 to MAYFIELD for his Carnegie Hall fee, an additional $20,000 to MAYFIELD, $8,333.33 to MAYFIELD for salary, and $6,053 .29 to MARKHAM for salary.

22. On about November 21, 2012, MAYFIELD transferred and caused to be transferred $100,000 from NOPLF to a YRI account designated for MAYFIELD.

23. On about November 30, 2012, MAYFIELD transferred and caused to be transferred approximately $15,000 from a YRI account, which MAYFIELD used to pay for a24k gold-plated trumpet from a trumpet manufacturer.

24. On about December 4, 2012, MAYFIELD caused to be mailed a 24k gold-plated trumpet to MAYFIELD.

25. On about December 5, 2012, MAYFIELD transferred and caused to be transferred $77,000 in NOPLF funds being held by YRI to NOJO, which was used to pay $66,000 to MAYFIELD, of which over $23,000 was spent at Saks Fifth Avenue and over $2,000 was spent at Harrah's Casino.

26. On about January 30, 2013, MAYFIELD and MARI(HAM transferred and caused to be transferred $85,000 from NOPLF to NOJO, which was used to pay NOJO operating expenses, $8,333.33 to MAYFIELD for salary, and $5,904.35 to MARKHAM for salary.



33. On about November 25, 2013, MAYFIELD and MARKHAM sent and caused to be sent a materially false and misleading email to NOPLF board members attaching the fraudulently altered NOPLF board minutes and falsely claimed the records justified the transfer of money from NOPLF to NOJO.

34. On about January 14, 2014, MARKHAM falsely informed NOPLF board members, employees of NOPLF and NOPLF legal counsel that NOJO did not use NOPLF money to pay the NOJO salaries of MAYFIELD and MARKHAM and that NOJO was not dependent on NOPLF funding.



**NEW ORLEANS**
P U B L I C   L I B R A R Y
F O U N D A T I O N

April 2, 2021

*Via Email:*
Assistant U.S. Attorney
G. Dall Kammer
Deputy Chief of the Fraud Unit
United States Attorney's Office
Eastern District of Louisiana
650 Poydras Street, Suite 1600
New Orleans, LA 70130

       Re: Supplemental Victim Impact Statement of the
          New Orleans Public Library Foundation
          *USA v. Irvin Mayfield; Ronald Markham*
          Criminal Action 17-241  Sect. "A"

Dear Mr. Kammer:

   I write to you to supplement the February 1, 2021 Victim Impact Statement of the New Orleans Public Library Foundation ("NOPLF"). The Victim Impact Statement submitted on February 1, 2021 outlines the deleterious effects of the illegal actions of Irvin Mayfield ("Mayfield") and Ronald Markham ("Markham") on the NOPLF.

   In addition to the negative impacts on the NOPLF detailed in the Victim Impact Statement, the illegal diversion of $1,123,032.00 in NOPLF funds by Mayfield and Markham forced the NOPLF to terminate its full-time staff members Kellie Gleason, who had been a NOPLF employee since 2009, and Ella Stelter, who had been a NOPLF employee since 2010. Since this difficult decision was reached by the NOPLF Board of Directors in 2015, the financial constraints facing the NOPLF have left the NOPLF unable to replace these staff members. Although the NOPLF maintained minimal administrative support services for several months following the termination of its full-time staff through a short-term personal service contract with Ms. Gleason, the NOPLF lacked any administrative support for multiple years and did not engage additional support personnel until 2020. Although the NOPLF again secured negligible administrative support during



2020 and 2021, all administrative support obtained by the NOPLF since 2015 has been provided solely through personal service contracts that minimized the amount of work authorized to be performed by the contractors.

As a further consequence of Mayfield and Markham's actions, the NOPLF was compelled to terminate its lease of office space due to the financial limitations of the NOPLF. The early termination of this lease necessitated the rental of an offsite storage facility for documents, equipment, and furniture.

As set forth in the Victim Impact Statement of the NOPLF submitted on February 1, 2021, the NOPLF sustained significant direct financial losses of at least $1,123,032.00 through Mayfield and Markham's unlawful transfer of funds from the NOPLF. The NOPLF has likewise suffered consequential monetary damages, including, without limitation, additional expenses incurred due to the premature termination of the NOPLF lease. As further discussed in the NOPLF's Victim Impact Statement, the untoward actions of Mayfield and Markham have also eroded public trust in the NOPLF and, moreover, threatened the integrity of the NOPLF, jeopardizing its very existence and necessitating substantial efforts to rebuild the NOPLF and its community partnerships. The NOPLF thereby respectfully requests that all of its losses be considered in the sentencing of Mayfield and Markham, including, but not limited to, the rendition of an order of restitution.

Yours truly,

New Orleans Public Library Foundation

Members:
Demetric Mercadel (President), Meb Norton,
Barbara Waiters, Sally Lindsay, Cleveland Spears,
III, Kathleen Coverick, Vonda Flentroy-Rice,
William (Bill) Settoon, Jennifer Kitner, and Dr.
Gabriel Morley

Barbara Waiters, for the Foundation

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA                    CRIMINAL

                VS                          NO: 053L 2:17CR00241

Irvin Mayfield  and Ronald Markham          SECTION: A


Declaration of Victim Losses


I,    the    New    Orleans    Public    Library    Foundation    ("NOPLF"),    residing
at 8680 Bluebonnet Boulevard, Suite D     in the city of Baton Rouge, in the state of
Louisiana, am a victim in the above-referenced case and I believe that I am entitled to
restitution in the amount of $1,123,032.00.

My specific losses as a result of this offense are summarized as follows: Direct financial loss of
$1,316,232 due to unlawful transfers of funds by Irvin Mayfield and Ronald Markham from the
NOPLF to the New Orleans Jazz Orchestra ("NOJO"); additional financial losses due to the
deleterious effects of Mayfield and Markham's actions on NOPLF fundraising efforts; intangible
losses, including significant harm to the reputation of the NOPLF and erosion of public
confidence in the NOPLF

I have been compensated by insurance or another source with respect to all or a
portion of $193,200. The name of address of my insurance company and the claim number for
this loss is as follows: No insurance; reimbursement made by NOJO
         SIGNATURE

I declare under penalty of perjury that foregoing is true and correct.
Executed on the  1st
day of Feb.  2021.

*Barbara Waiters by Blan Nagin*
NOPLF



# LAURANCE EUSTIS III

JUNE 26, 2021

The Honorable Jay C. Zainey
U.S. District Court for the Eastern District of Louisiana
500 Poydras St.
New Orleans, Louisiana 70130

Dear Judge Zainey,

I write regarding the sentencing of Irvin Mayfield and Ronald Markham

A lifelong citizen of New Orleans, I have been involved in community and public affairs
and most recently served on the board of directors of the New Orleans Public Library from
June, 2015 until August, 2020.   I have closely observed proceedings and events
surrounding this case from its inception.

Despite guilty pleas, to my knowledge, neither defendant has made a public statement of
contrition, or indicating remorse for their actions associated with the Library Foundation.
These actions were deliberate and repeated over the course of several years.  And when
uncovered, they made specific, though transparent, attempts at a cover-up.

Neither Mayfield nor Markham have apologized to the citizens of New Orleans or to those
who made prior good faith donations to the Library Foundation.

Citizens with limited means rely on the Library as a public resource.  For instance, if you
are seeking a job and don't have a computer, there are few options. Today's job market
relies almost entirely on digital communications, presenting a high barrier for the
unemployed.  The Library provides the public with access to computers.  However,
budgets limit the number of computers and there are long lines waiting to use them.
Mayfield and Markham's diversion of funds had a direct and harsh impact on people
standing in those lines.

Mayfield and Markham's failure to show remorse and apologize to them is profound.  It is
not too much to say it is unconscionable.

I hope you will include the above considerations as you weigh sentencing.  Please remove
Mr. Mayfield and Mr. Markham from our community for a substantial period of time.

Respectfully,

*Laurance Eustis III*

My name is Bernard (Barney) Floyd. I've been a professional musician/trumpet player for over 45 years . I've been accredited with three winning Grammys and five nominations. Also, I have worked in a vast array of markets throughout the country. Also spending time in the music markets of Japan and Germany.

And have been an active member of the music community in New Orleans since 1986.

I am writing on behalf of Irvin Mayfield, his commitment , contributions and impact on the music industry, local and a far. All having positive influences in local communities and cultures.

Twenty years or so into my career as a professional musician , I had the opportunity to cross the pass of Irvin Mayfield when he was probably 14 years of age or so. Even back then I thought he was very gifted, had great vision and saw unlimited possibilities for the music industry. Always tryin to expand the musical envelope.  Throughout the years it seemed his vision strengthened.  Promoting, while embracing the rich culture and music of New Orleans and its players. No matter the age,color or demographics of the individual musician.  He showed me/and many, new views and passion for the industry.  An industry which I have

1

been dedicating my life to.  I have worked for hundreds  of agencies and band directors/leaders in my career, and as a side musician I realizes it takes a certain ego and conviction to think outside the box for the person in charge.  In music or any other chosen field for that matter.

Irvin seems to have a knack to create his own legacy as well as strengthening the awareness and raise the bar of the music culture in New Orleans. (Sidebar) I do have to say, out of all my years of playing music, under Irvin I have raised my standard and understanding of music and it's art.  On more than one occasions I remember thinking .."we're not going to play this or do that?" And always saying afterwards…"genius, who would have thought"

. Daily employing more musicians and service industry people then any band leader I've worked for in New Orleans , whether Irvin was on the bandstand or not.  Not to mention when you work for band leaders, everything reflects back to the leader.  Not Mr. Mayfield,  the city of New Orleans, and the culture of New Orleans, as well as the individual players were all featured and winners at every performance.  He also reached out extensively to the young players…in all markets.   Trying to have them find their purpose and talents.  A quick story. I remember a few times while touring, Irvin Mayfield initiated interventions for specific members of the jazz orchestra. To curve the drinking habits and keep the standard of music and respect at high levels. He always said we needed to always be at our best since it had a direct reflection on the music, musical community and the city of New Orleans. These were held

2

when on tour.  Irvin always re enforced we were representing the city of New Orleans, and always promoted the city every where we traveled.   One other occasion was when one of the players contracted Bell's palsy, preventing him from playing his trumpet.  He was the sole provider for  his family.  Irvin kept him on the bandstand and working for that year.  In addition to covering his part.  Irvin had him refine his percussion,as well as singing and musical skills.  After a year he started playing his trumpet again. I remember it took years for him to regain his trumpet abilities again to effectively compete in the market.  He lost so much muscle strength from the time off.  As with many other players who had laid off in their careers now have similar issues. I find taking one or two days off puts me about three to four days behind where I was…. trumpet playing wise.  But, He now has a successful multi musical career. Speaking of having to play trumpet and the obsession that goes along with it.  I want to leave you with my trumpet thoughts. I've know thousands of trumpet players.  All levels and ages. One thing in common is we all have to play every day.  We want to and we need to.  Trying not to go into details. With the over 300 hundred muscles involved in making the embouchure for trumpet playing. As it was said by my college trumpet teacher. It takes every day to keep things working correctly. If I have a performance weeks away, I have to play every day to assure proper endurance and execution for the performance. On certain engagements I'll spend weeks preparing just to keep up my performance standards. Much like an athlete.  A

very prominent LA trumpet player said " it's like running the mile. You have to train beyond the event.  If you have a 3 hour performance you have to train 5 hours daily to prepare for it.  Music doesn't have much loyalty or tenure...you are always competing with people of all ages up on their game. You sound bad ... your out."   The elements involved are physical, spiritual,  creative, methodical, to name a few.  I know people in their eighties, well retired (father in law for one)... plays an hour every day.  Weekend players with day jobs.. play three ,four times a week.  It's an obsession.  For me it keeps me balanced, and focused.  I feel something is not complete if I can't get the horn to face daily.  I know Irvin feels the same.  It's something I'm sure he can't do without.  On that note I know it goes further for Mr. Mayfield.  In the years I've know him I've watched him pursue with great success trumpet,piano,guitar, arranging. He just can't stop creating and pushing his creative limits.  It's something we have to do every day.   Tuning pianos is another field I work in.  I have clients who are surgeons.  Don't play in public, but have to play everyday.  It keeps them focused, releasing tension and stress and allows them stay at the top of their game mentally.  Just something musically creative people have to  do.  One final note.  Most people I run into that have negative opinions of Irvin Mayfield have never really got to know or worked with him.  All people are very complex. Great visionaries are even more complex and one needs to spend more time around them to understand them.

4

Thanks for having the time to read this.
Barney Floyd

Greetings Judge Zainey:

We hope and trust this letter finds you well.

My name is Claudia Peña and I am the Executive Director of a national arts organization called *For Freedoms.* Our focus is modeling and inspiring civic engagement. A year ago, we were introduced to Irvin Mayfield through a long-time partner and trusted friend. We were immediately moved by his commitment to community and vulnerable populations. Just listening to him speak about his vision inspired new ideas and pathways for our mission of reaching disengaged communities.

That initial meeting burgeoned into a working relationship and soon thereafter, we began planning an event for artists in New Orleans. While we'd learned of Irvin's past transgressions, as artists, we aspire towards the belief that no one should be defined by their worst mistake.  So, we continued our planning and found him to be honest, direct, helpful and certainly trustworthy. As some of our plans included the handling of funds, I can say without equivocation that we had no hesitations in conducting financial business with Irvin. Every interaction with him proved him to be a man of integrity. We ended up canceling the events because of the specter of COVID-19 but hope to re-schedule in 2022 and pray we will be able to work with Irvin then.

At For Freedoms, we believe in a justice that brings balance and overall *good* to impacted communities. While we are not in the position of representing the state to administer justice – and truly we are so grateful that *you* do this work – we can say what a loss it would be to everyone should Irvin be sent to prison.

He is no threat to others, either physically or financially. He has been paying restitution, faced the mortification of being publicly shamed, lost friendships and work partnerships and perhaps the most crucial of all, has sat privately with own guilt while bringing himself to account. To the extent that the public's opinion means anything, we believe he has paid for his sins and brought things back into balance. If he were incarcerated, it would only create a new imbalance and a huge hole in the very important work to which he is dedicated. We need people like Irvin. Especially in reaching youth communities, people of color, artists and those from under-privileged backgrounds. He has dedicated almost his entire life to the people and though he violated trust nearly a decade ago, he has made up for that breach – and then some. I know, without a doubt, he will continue to do right by the people for the rest of his life if given the chance.

Very truly yours,

Claudia Peña
Executive Director, For Freedoms

# DAYAL S. REDDY
### ATTORNEY-AT-LAW
### NOTARY PUBLIC

Honorable Jay C. Zainey                                   September 21, 2021
United States District Court
Eastern District of Louisiana Section "A"
500 Poydras Street, Room C455
New Orleans, LA 70130

**BY HAND**
Re: *Irvin Mayfield*, 2:17-cr-00241, EDLA, Section "A"

DearHonorable Jay C. Zainey:

I am writing this letter at the request of Mr. Mayfield's attorney, Mr. Claude Kelly. I welcome the opportunity to share my insight for a compassionate sentence for Mr. Mayfield.

I understand that my friend and office mate, Mr. Richard Anderson, is also providing a letter for your consideration. Mr. Anderson and I actually met as opposing counsel about five years ago, but over the course of resolving a dispute between our clients and social lunches afterwards, we developed a friendship which led to us sharing office space. Soon after moving into Mr. Anderson's office, we began collaborating on cases because we share similar sensibilities, both professionally and ethically.

I mention this because soon after I learned about some difficulties related to Mr. Mayfield's mother's health, I was eager to assist in helping an innocent, local (former) lifelong teacher with securing access to resources that she needs for her health. I insisted on helping Ms. Joyce Reed-Mayfield (Mr. Mayfield's mother) without ever having met Mr. Mayfield and knowing very little – beyond the media coverage – of Mr. Mayfield. This was approximately early/mid – 2018. Mr. Irvin Mayfield was a stranger to me at this point, but his mother's plight was not an uncommon circumstance that attorneys like me are dedicated to addressing.

Over the course of the next few months, I performed my due diligence, i.e. I met with Mr. Mayfield, and his family, and some of his support network. I perform a fair bit of pro bono work when I come across sympathetic cases, and I quickly decided that the urgency to provide Ms. Joyce Reed-Mayfield access to healthcare and secure her property superseded my desire for fees – on a moral level.

Mr. Mayfield's mother, Ms. Joyce Reed-Mayfield, was temporarily cared for by an elder brother of Mr. Mayfield – Woodrow Reed - who was not providing her the care or resources she needed. This deficiency is what led us to have her interdicted and have Mr. Mayfield appointed as her curator, in order to provide for her health and manage her affairs in September 2018.

Mr. Woodrow Reed has a storied felonious history; was avoiding necessary medical care/appointments; absconding with retirement/social security payments; and even selling basic appliances from Ms. Joyce Reed-Mayfield's home without telling her. We later learned that Mr. Woodrow Reed sold a piece of property - that Ms. Joyce Reed-Mayfield purchased with her hard-earned income as a former teacher – well after Ms. Joyce Reed-Mayfield suffered from

multiple strokes and could not consent to such a real estate transaction, but to Mr. Woodrow Reed's personal monetary benefit. Additionally, we learned that prior to the September 2018 interdiction, Mr. Woodrow Reed's negligence and (probable) exacerbation of Ms. Joyce Reed-Mayfield's (their mother) debts were unaddressed, leading to at least two debt collection lawsuits against Ms. Joyce Reed-Mayfield and her hard-earned properties.

I mention the past paragraph because since the September 2018 interdiction, Mr. Irvin Mayfield has been diligent in ensuring his mother, Ms. Joyce Reed-Mayfield, receives the best healthcare; he has coordinated with his mother's retirement policy to have her retirement benefits remitted to himself for his mother's benefit, rather than to Mr. Woodrow Reed (as was the case for some time prior to her interdiction), and he has taken it upon himself to manage his mother's assets to avoid any further loss/encumbrances for his mother's benefit.

I am personally aware the above is true because I have seen his mother's health and affect improve since he was appointed her curator and he has diligently addressed her necessary medical needs. I personally assisted in having her retirement benefits re-assigned to him, for his mother's benefit, which took several months of administrative effort. Furthermore, I have investigated and represented Ms. Joyce Reed-Mayfield, with Mr. Irvin Mayfield as curator, in cases addressing Ms. Joyce Reed-Mayfield's property and debt.

I have engaged my efforts as an attorney for Ms. Joyce Reed-Mayfield's benefit, with Mr. Irvin Mayfield as curator, because Ms. Joyce Reed-Mayfield deserves better than she has received as a committed, retired school teacher in New Orleans. I have received no compensation, and I have no agreement for any compensation or legal fees. I have forwarded court costs/expenses in every matter in which I represent Ms. Joyce Reed-Mayfield's interests.

I do so because I am fortunate enough to have the resources to absorb the legal costs needed to safeguard the interests of a deserved person like Ms. Joyce Reed-Mayfield. I am fortunate that I can provide effective representation for her, as well as a few others, that I wish they did not need, but for the unfortunate circumstances they face due to prior ineffective assistance.

This is the reason I decided to provide my private, residential property as a property bond in June 2019 in this federal criminal matter for Mr. Irvin Mayfield to travel and perform internationally, so that he can capture whatever funds he can for the benefit of his family. I am aware and have met his younger disabled[1] brother – not Woodrow Reed - who Mr. Mayfield provides love and care. I have seen this disabled brother be treated by Mr. Mayfield's family and daughter like a best friend/family member.

All of my efforts to this point have been pro bono, because Mr. Mayfield has shown me that he is best equipped to provide for his mother and disabled brother. I have observed the environment these individuals had before and after the October 2018 interdiction, and Mr. Mayfield has ensured a warm and therapeutic environment for the benefit of his mother and disabled brother since his mother's October 2018 interdiction.

For the record, I have not been forced, coerced, promised, demanded, threatened, etc. anything to draft this letter. I am an attorney in good standing. I have never been accused of misleading any court or judge, nor would I do so.

Sincerely,

Dayal Reddy

---

[1] I am not disclosing specific medical information due to HIPAA concerns.

October 8, 2021

Re: Irvin Mayfield, letter of recommendation

Dear Judge Zainey:

Irvin Mayfield is one of the best trumpet players in the world. His rare talent level is so obviously manifested, well-regarded, universally respected, and often lauded that, regardless of anything else he does, good or bad, for the rest of his life, "one of the best trumpet players in the world" will likely be the first line in his obituary. The second will be about his federal crime.

He is one of the tiny handful of generational greats to come out of the city of New Orleans.

In June, he offered a free concert in our city that was well-attended by people from all walks of life, just as our community emerged from the horrors of Covid. It felt a lot like the first sounds of life after Katrina. The concert was a coming-out party for all of us who had been hopeless, trapped, grieving, and joyless for so long.

Irvin's music does that to people, not just in NOLA, but around the world. Irvin is a uniter. He brings us together, regardless of race, age, or income bracket, and offers us something beautiful—his music.

There are many talented musicians in the city of New Orleans, but there is only one Irvin Mayfield. As a fan, I can identify his sound with only a few notes in my ear and know unequivocally that it's Irvin. His music connects me to home and makes me proud.

As you will hear from his fans, friends, and family, Irvin is a good man. He's also a world-class musician. He is worth much more than the summation of this one chapter in his life.

His imprisonment would be tragic on a personal level, of course, for him, his family, and his fans, but, worst of all, silencing a musician of his talent, perhaps forever, would be a much greater loss for the city as a whole and, yes, the world.

Being a great trumpet player does not mean that Irvin is a man without faults. Like all the rest of us in this room, Irvin has made mistakes. He would be the first to admit that. What greater good is served by silencing another African American man with a gift no one else can replicate? Irvin is 43 years old and in his prime as a musician. His imprisonment would rob the world of something only he can provide.

Does atonement only count as proper redress and remedy if it's imprisonment? Is our legal system so unimaginative and uncreative that we cannot envision a more nuanced consequence? I am reminded of parents who beat their children to teach them not to hit other kids on the playground. How does imprisoning Irvin help anyone? Who is served by that? What benefit does society receive? What is made better?

Would it not be better to require Irvin to give back to the community he has wronged to help repair the damage he has caused?

This is a rare opportunity. Irvin is a musician who could be used as a role model within our community to show what can happen when someone shows true remorse and dedicates his time, talent, and resources to righting that wrong and making things right.

Sentence Irvin to teach music to aspiring young trumpeters in New Orleans and outlying areas. Order him to provide a series of free concerts to those who would never otherwise be able to see or hear someone of his talent level. Require that a portion of everything he earns for the rest of his life be donated to the library fund. We have a resource here that we could use for good, an opportunity to do better than we usually do by locking up another black man.

Irvin owes us. He disappointed us—his fans, his family, and his city. But he is a man of character, and he is better than one bad decision. Let him pay us back and teach everyone a lesson by accepting responsibility for his actions, offering genuine reparation to those he has harmed, and making good on a second chance—for Irvin, my favorite trumpet player in the world, but also for the rest of us.

Locking Irvin up does nothing positive for anyone. His imprisonment affects more than just him and his family. It would be a black mark on the soul of our city.

You know what every real New Orleanian will say if Irvin is sent to prison? It won't be: "he got what he deserved." People will say: "what a waste."

Irvin screwed up. He needs to make it right. We need to see him atone for his mistakes publicly. There are so many ways that he could do that which would be humbling to Irvin, a just punishment, and simultaneously serve the public good.

Sincerely,
Marian Hannah

The Honorable Jay C. Zainey
Section A
500 Poydras Street, Room C455
New Orleans, LA 70130

Dear Judge Zainey,

I have known of Irvin Mayfield since before I officially met him on March 7, 1998 when he was playing at the Funky Butt Jazz Club on Rampart Street. I had read about a band that he had coordinated with Bill Summers and Jason Marsalis called Los Hombres Calientes. That chance meeting that night and a conversation about that band led to my fledgling label signing them for a three record deal four days later and releasing what later would be Billboard's Latin Jazz Album of the Year the following month. It was the top seller at both the French Quarter Festival and the jazz festival in April 1998. Since then Irvin and I have worked on 16 projects together.

I have tremendous respect for his work ethic, his talent, and his ability to find opportunities. Throughout the years he has pushed me to take on bigger projects: our first enhanced CD with video components, our first DVD, our first and second coffee table books with CDs included, and even a graphic novel.

I have watched him open a number of successful clubs, and put together amazing charitable events such as Love Sessions, a week of events where the dollars were provided to various charities. I also watched as the New Orleans Jazz Orchestra was founded, and then toured the world with a 17 piece band and won a Grammy award. I watched as he helped turn a defunct department store into the world class jazz venue, New Orleans Jazz Market, and helped rehabilitate central city.

It has been painful for me to watch him lose so much these past several years. He lost teaching positions. He lost the jazz orchestra. He lost music venues with his name on them.

I believe that he is a valuable member of our community, and he is a friend.

Best Regards,

Mark Samuels
President
Basin Street Records

June 15, 2021

Honorable Judge Jay Zainey
United States Eastern District of Louisiana
500 Poydras Street, Room C455
New Orleans, LA 70130

Re: Case #:  17-241

To The Honorable Judge Zainey:

I have known Irvin Mayfield, Jr. ("Irvin") for nearly fifteen years. We met post-Katrina, following the untimely loss of his father as a victim of drowning, when a young, yet lived, 28-year-old Irvin was speaking to a group of us then law students visiting New Orleans to provide legal aid following the hurricane. Irvin spoke about the concert he gave in desperation for any details surrounding the whereabouts of his father only to shortly thereafter learn his body was found on the corner not too far from his childhood home. He spoke about jazz, the integral part it would play in the recovery of the city and what he was doing to move the city forward.

While some could have been flattened by such a traumatic loss of a parent or the destruction of his community, Irvin poured himself into the neighborhoods and streets he had grown up on. Irvin utilizes his passion and ingenious gift for music, his intellect and astuteness for development and his innate desire to help and assist members of his hometown, New Orleans. As a result, he brings inspiration, hope, economic development and revitalization to a city that is too often forgotten beyond infamous festivals.

While most capable musicians play their instruments to tell a story, Irvin has used his versatile music skills to be more than a storyteller, but rather an advocate and an entrepreneur for the arts and the city he loves so much. Quite notably, I have personally seen his focused attention on the youth.  Following large concerts or when invited to schools, Irvin takes a special interest in the younger generation - whether it is a quick trumpet lesson, or listening to a creative piece they have composed and providing feedback or just showing them the basic lesson of how important it is to master a craft. Even more recently as he has introspected on his own actions, he has dedicated his time to providing a safe space for fellow and aspiring musicians to hone their skills and give them an invaluable, productive outlet.  He has also used his time to produce hip hop music for local young men of color or hosting gatherings to showcase talent that would otherwise go unheard.

I hope that your Honor takes this letter into consideration and Irvin's contrition in your deliberation of his sentencing.

Sincerely,

Prashanthi Rao Raman, Esq.

August 7, 2021

Judge Jay C. Zainey
United States District Court
Eastern District of Louisiana
500 Poydras Street
Room C455
New Orleans, LA   70130

Dear Judge Zainey:

My letter to you comes in support of leniency for musician Irvin Mayfield.

My background is in education, the arts, and public broadcasting.  The last 22 years of my
professional life were as President & General Manager of WYES, Channel 12.  I retired
8½ years ago.  Since then, I have been heavily involved with Rotary International, working
to improve communities locally, regionally, nationally, and internationally.  And in full
disclosure, my stepdaughter, Cydney married Irvin last November.

I, of course, had heard of Irvin before he had met Cydney.  I had seen him perform
several times.  And I had known of the case before you, although I am not aware of all that
happened, and can not speak to it with any relevant insight.

What I can speak to is the Irvin Mayfield I have met and talked to numerous times since
Cydney first brought him home, and why I am asking for leniency.  Almost all of this
comes down to the lifestyle and humanity.

When you meet Irvin, as I have, you first discover his responsibility to his family.  His
mother, a former New Orleans public school teacher, has dementia and diabetes (and lost
a leg as a result).  He has the primary responsibility for her, and she lives with him and
Cydney.

His older brother is autistic. He has the primary responsibility for him as well, and he, too, lives with Irvin and Cydney.

He shares responsibility for his four-year old daughter Imani with her mother. His parenting skills are superb, and she regularly is a presence in his home.

There is never a moment when you need to be concerned about his family being cared for, and yet he never broadcasts the fact or looks at it as anything other that what he naturally should be doing.

I was more than a bit pleased I discovered that the man Cydney brought home has the same drive for a healthy lifestyle as she has. Good nutrition is a constant element of their life. Exercise is a daily presence. This is something that can only help in the caregiving for his mother and brother. And the drive for a healthy lifestyle cannot be anything but a positive element for an impressionable four-year old to experience.

Again, this is nothing that he talks about. It is simply the way he lives.

And then there is the nature of his life of music. He has never stopped working on his musicianship. He and Cydney have started a major initiative to create a physical performing venue for New Orleans artists where they can receive a decent wage when they perform and not just rely on audience tips.

As a former performer myself, I was very interested in how he affects the people around him. How he works with them. And I have been overwhelmed by the generosity he has shown them. He has created a supportive atmosphere among the performers and staff, never hesitating to allow them to take centerstage. He is creating something very special in New Orleans, which brings me to my final point.

When he could have taken a step back, and removed himself from the city itself, he has not given up the responsibility he sees he should take to help the city grow. He cares about this city and continues to work to improve the quality of life for himself and those around him.

I think it serves the public interest to show leniency.  I believe he is playing and can continue to play a valued role in this region.

Sincerely,

Randall Feldman

**Rotary**
Club of New Orleans

Assistant Rotary Coordinator, Zone 31, 2020-23
Secretary, USA Section, USA-France Intercountry Committee, 2020-23
Advisory Board, Disaster Network of Assistance Rotary Action Group, 2020-21
Governor, Rotary District 6840, 2016-17
Member, Rotary International Communications Committee, 2013-14
Vice Chair, Host Organization Committee, 2011 Rotary International Convention
President, Rotary Club of New Orleans, 2003-04

# Rev. Charles David Billings Jr.

April 11, 2021

Judge Jay Zainey
Federal District Court
Eastern District of Louisiana

Dear Judge Zainey:

I am writing to you about my friend and colleague Irvin Mayfield. I became acquainted with Mr. Mayfield when he and I served as organizers and mentors to a community-based organization, Community United for Racial Equity (CUEE). I have also participated in several of his community jazz events and his courses at the University of New Orleans.

In my opinion Mr. Mayfield has been one of the finest cultural ambassadors for the City of New Orleans we have known. He has spread our unique musical tradition worldwide. In the aftermath of Katrina, he crisscrossed the world telling our story, bringing recognition to the immense suffering of the residents of our great city, but even more to the hopes and resilience our people demonstrated.

Irvin Mayfield is a genius. He embodies the soul of the City and its great musical traditions. His lectures at the University of New Orleans on Louis Armstrong were artistic masterpieces.

We must not lose his presence on the world stage. As a United Methodist minister and a resident of New Orleans for close to fifty years, I am most proud to be considered among those taught by and befriended by this good man.

Respectfully,

*David Billings*

Rev. David Billings

September 15, 2021

Judge Jay Zainey

United States District Court, Eastern District of Louisiana


Your Honor:

In my former role as SVP of the New Orleans Convention & Visitor's Bureau (now New Orleans and Company), I had the pleasure to work often with Irvin Mayfield as a board member of our organization. Responsible to win business for the city, we frequently leveraged our cultural asset of jazz music and Irvin was on many occasions an instrumental advocate in sharing customized messaging to clients that were in consideration of New Orleans for their multi-million-dollar conventions and the thousands of attendees who represented extraordinary ancillary spend for local businesses.

At shows and tours around the country, Irvin volunteered his time abundantly as an ambassador of the city and welcomed our team to bring target group stakeholders and media to join the New Orleans Jazz Orchestra where he would personally recognize them for what was always a unique and memorable experience – world class in quality and unparalleled by what any other city in America could provide.

In building a culturally relevant marketing campaign for groups and visitors to the city, Irvin assisted me to partner with his label Basin Street Records. As part of this initiative, we were able to feature many real local artists both in the campaign but also in recommendations to our clients for paid work at their events and meetings. As another element of the partnership, he secured over thirty local artists to a special album commemorating the 300th Anniversary of the city that he produced without personal compensation and which hit the Billboard Charts at #1 – acclaimed by local jazz critics as one of their favorite "New Orleans" feature albums of all time.

Specific to the New Orleans Jazz Market, I worked with the launch team to assist them in understanding how the facility could be utilized and marketed for special events that would enhance their revenue stream and to offset base operating costs. As a former resident of Toronto, Washington, D.C., and Boston – the project seemed a brilliant activation for the Library Foundation in alignment with what I had seen happening in other cities where facilities were seeking financial self-sufficiency and driving alternative programming to entice younger audiences and communities within metro-markets that had less geographic access to broadband internet and library services. Irvin's team opened the Jazz Market to me for its first event, to host all the corporate partners of Essence Festival from whom we hoped to win company specific opportunities and he performed graciously with no fee on that occasion as he did on many others to our benefit as well.

Without question, I feel confident to say that Irvin was the most dynamic, eloquent, and passionate artist we had to rely on who understood the nature of our business relationships and who was willing to generously share his time to assist us in achieving results that were beneficial to the community.

Of a personal note, there was no individual in New Orleans that so freely opened their home to me, introduced me to their family and friends, and made me feel more welcome than Irvin. His love for the city and for its food, its music, its people has always been contagious and his creative spirit that he shares so broadly should be a cherished asset.

In the time that has passed since I left New Orleans, I have watched so many heart-breaking challenges evolve for the city and for our country.  More than ever, I feel like our artists and those who are willing to extend their personal spirit of inspiration to elevate and bring us all closer are more valuable than ever.

In support of Irvin, I will always be proud to call him a colleague, a partner, a neighbor, and a friend.  For whatever he might not have known about operating a non-profit or dealing with public funds, he was most certainly always well intended in my experience.  I look forward to a time when he can contribute again without the blight of difficulties that have prevented us all from the benefits of his creative vision and generosity.

Cara Banasch, MBA

Vice President, Omni Hotels & Resorts


Cc:     Claude Kelly, Federal Public Defender

Wynton Marsalis

Dear Judge Zainey:

I write regarding my good friend and colleague Irvin Mayfield. I have known Irvin most of my life, and for most of his life, he has been a staple of my musical family. My father, Ellis, was his teacher and mentor; I consider Irvin to be a little brother. I am aware of the poor decisions Irvin made in the process of building a home for the New Orleans Jazz Orchestra while also creating a community resource for the New Orleans Public Library. I have also witnessed how Irvin has accepted the public and private responsibility for his actions, and as you will soon deliver your decision for his punishment, I humbly ask that you please take a moment to hear my thoughts:

Culture is New Orleans' greatest asset, and Jazz is the centerfold of that culture. And being the first person to build a space solely dedicated to Jazz in the United States of America, I am keenly aware of the power that our city's music has on the world. But Irvin is the only person who has succeeded in building a space for Jazz in the city that created the music. He is the singular force presenting and playing the music on behalf of our culture, uniting New Orleans communities who may otherwise have found the music irrelevant. He was determined to lead by example, to prove that a jazz musician could make it in New Orleans and have a powerfully positive impact on the city by using the music, itself. He was determined to help us escape the commonly held belief that our music is cheap entertainment, best heard when the audience is inebriate, or on their way there. And against all odds, Irvin did so much to elevate the music and our culture.

After Irvin spent his early twenties living with me at Lincoln Center in New York, I assumed that he would leave New Orleans for better opportunities, like the best of us did — Louis Armstrong, Sidney Bechet, myself, included. But Irvin has always had a deep commitment to his city, and I believe it deepened further after his father drowned in the aftermath of Hurricane Katrina. After the storm, I served on the Mayor's "Bring New Orleans Back" Committee as Chairman of the Cultural Sub-committee. Irvin also served on this sub-committee. Our detailed report observed:

- 260 nonprofit cultural institutions (museums, art centers, performance halls) suffered extensive physical damage;
- 750 commercial arts enterprises (music cubs, art galleries, recording studios) were decimated;
- The four general categories of our culture that needed to form the foundation of our rebirth were Music, Literature, Cuisine, and Art and Architecture

And in 2006, soon after the storm, we recommended a three-year strategic investment to rebuild our cultural economy. The central component was: to provide support for community-based cultural traditions; to rebuild / develop community arts centers and cultural attractions in all neighborhoods; and encourage the creation of new cultural venues across the city to celebrate its history, diverse neighborhoods, and cultural uniqueness.

Irvin was as dedicated to achieving these goals as I was. In fact, Irvin's motivation to get involved with the libraries and grass roots cultural institutions came from these efforts we shared — to rebuild New Orleans and restore our cultural traditions. His 2008 plan reimagined the library system to be a gateway for education, information, culture, and recreational enrichment for all New Orleanians. It even featured a storefront prototype to be located in the Recovery Zone along Oretha Castle Haley Blvd. in Central City, demonstrating how libraries could be more accessible to the otherwise-ignored neighborhoods.

I was so saddened to hear about the direction this ended up going, because I saw the passion Irvin had for the New Orleans Jazz market, which he envisioned as the city's own version of Lincoln Center: a performance space, a library annex, and a repository for the archives of our city's treasured jazz musicians. He was excited what this reality would represent for the next generation of young musicians with serious aspirations — that they, like himself, would not be compelled to leave the birthplace of jazz. I am heartbroken that his vision was derailed by arrogant and careless actions. Irvin has paid and will forever pay an inestimable price for this deferred dream.

Your Honor, I want to stress that I understand that Irvin has admitted to committing a serious crime, but I do not believe that he is a hopeless nor heartless criminal. He is a dreamer who inspires those around him with large, encompassing ideas. He is a family man who adores his mom, his brother, Che, and his children. Furthermore, I know as a jazz musician, that he has paid an additional price beyond whatever punishment he receives upon sentencing. Not only is his reputation forever damaged, I'm not sure that he will ever have even half of the success his enjoyed as a world-touring musician. And while I understand that he must now face the consequences of his actions, I have great hope that this story is not over.

I hope for the city, its culture, and for young artists yet to be developed that there is a remarkable building in central City waiting to fulfill its purpose. I hope that these years without Irvin have taught us how important his vision and energy are to this cultural ecosystem. While Irvin is a world class performer, he is even more so a teacher in the tradition of my father. The loss of his services in both capacities is unfortunate for fans and students because he still has so much to give. And to have him in federal prison now is to cast yet another shadow across the young artists and artistic spaces he has begun building during these years in public shame. He is much more useful to our citizenry with a trumpet in his hand, leading a cultural movement. His remorse has and will continue to be reflected in his achievements, on behalf of those whose trust he violated.

I have seen that Irvin is more dedicated to this city now than ever before. He is determined to prove to his family, friends, colleagues, and community that he can still be a great asset. I hope Your Honor can find some creative way to make him pay his debt to society that will punish him and enrich us at the same time.

I thank you, Your Honor for hearing me out.  If you have any thoughts or questions, I would be happy to talk at any time.

Thank you again,
Wynton Marsalis

Judge Jay Zainey
United States District Court
Eastern District of Louisiana

Your Honor:

I have known Irvin Mayfield for over 20 years. I met him at the House of Blues right after he returned to Nola from New York after living with Wynton Marsalis. I had just opened the Ritz Carlton Hotel in 2001 after five years of challenges and market changes. I have actually taught classes on that complex development to graduate students at Tulane, Loyola and LSU.
Over the course of my career, of course the Ritz was the crown jewel in my portfolio, but I've done over $1 billion of other real estate development in my 40 year career as well. One of my management skills is recognizing talent in other people. Not just talent in a specific field but talent in a broad range that indicates to me the potential to be more than they are at the current time that you meet them. So of course, I know Irvin as a talented musician, but I also know him as a loving father, committed husband and an incredible son to his mom, Joyce, and brother, Che. And a great teacher! And over the last 20 years I have come to know them all. He also has the talent, intelligence and gift of public speaking to become much more for our city than just another great musician.

At the time I met Irvin I had retired for the first time at 45 years of age and truly wanted to utilize the Ritz Carlton and my beautiful residence on the roof for the good of our great city. My family has been from Louisiana since 1755 and while I came from very humble roots my Army Colonel father and very religious mother instilled a sense of responsibility in helping those that cannot help themselves. And I try to live my life according to the principals they taught. I have also raised three wonderful children and a foster child. All are successful members of their communities and my daughter Kelly Juneau Rookard is a very successful local lawyer that has been in your court. After I met Irvin that long time ago at the House of Blues I got to know him better. After a few more meetings I knew that our city had the next great talent to act as an ambassador for the creative industry. I vowed to use my residence on the roof of the Ritz for that purpose as well.

Over the 23 years that I lived there I hosted over 800 events averaging 200+ people for just about every political, social, nonprofit and Benevolent Association that requested the use of my home. I only mention this to say to you that Irvin never one time did not agree to play for that vast variety of events for free. And I asked him regularly especially when I had dignitaries from outside of our city attending. And he always amazed the guests. He became the face of New Orleans Jazz after many other of our jazz greats left to live and achieve their fame in other cities. Irvin was committed to the city of New Orleans and I happily agreed to mentor and support that mission.

I've sat on over 35 board of directors in my career and I even agreed to be one of the original members of the New Orleans Jazz Orchestra. I'd always thought it a shame that we had never had an organization dedicated to the original music that made our city so great. But as was typical of my career path, I helped to advise them on the startup and resigned after three or four years to pursue other philanthropic missions abroad. And I happily followed their success especially after Katrina devastated our city. Those were the times that Irvin's character truly came through and he became the poster child for our recovery.

I do not know the facts of the case that landed him in your court and I am not writing to excuse his conduct. Based on what I have heard and what I know about Irvin, I can surmise that he was in over his head on the financial end and made serious errors in judgment. I know myself that Irvin can get caught up as a visionary on the dream of a project. I do remember that Irvin was deeply committed to bringing that Jazz Market to Central City and largely consumed by that goal. I also know what fame can do to color a person's mindset and lead to serious misjudgment and arrogance. I am glad he accepted responsibility for what he did. I am also glad that this has given him an opportunity to step back and reevaluate his priorities.

I do feel it is necessary to correct some inaccuracies about Irvin that I believe are relevant to Your Honor's decision. There have been some recent misstatements in the press about Irvin and his recent performances, insinuating that he has been making money from playing music to "sold out" audiences. And I sadly know from experience that the press is never a good source for facts. I have now retired for the fourth time and after this year losing my CEO Brother and myself recovered from Covid, I am re-committed to helping our city recover from these latest disasters. I do know about Irvin performing at the Magnolia Mansion personally, so I wanted to set the record straight. I agreed in May of this year to become an advisor to a local prominent investor and their New York partner to manage the Magnolia Mansion. Those negotiations were successful with the owner and the team is now engaged in long term managing that facility.

Because of the continued financial and legal challenges of the existing ownership the team also recently attempted to enter into a prospective agreement to purchase the Magnolia Mansion on the corner of Prytania and Jackson. Those negotiations are ongoing. The current owner has a host of troubles, both financial and otherwise, and their group saw it as an opportunity to re- develop a vastly underused property. The New York investor has experience in developing boutique hotels which offers live entertainment. And my love and talent is in restoring our beautiful historic properties within the city. This project is not even six months old. At this point, the investment group is paying a net lease amount sufficient for the owner to pay the mortgage note. The other expenses of the hotel are being determined in a test phase to evaluate the potential of the property. I know the business plan presents an opportunity to invite a variety of artists to perform with no cover charge. And sadly but is typical of the Nola market, revenue is generate for these performances solely from a cash bar and occasional food. To date that revenue has simply covered the staff and food costs. To my knowledge and while most of the other musicians have been paid, Irvin Mayfield and Ronald Markham have not been paid when they have performed but have donated their efforts in support of the bigger mission. The team is still in the testing phase, but do feel the facility has great potential.

I also want to make something clear about Irvin himself: he is a good man, who made a serious mistake. I hope he does not go to jail. I cannot see the justice in putting another black man in prison especially one that has a history and level of potential to benefit our entire city. Besides being devastating to his family, which sorely needs his guidance, I think it would just be counterproductive for our city's recovery. I have major investments in our city. I am still a part owner of the Ritz Carlton Hotel, among other ventures.

Even though I am retired now for the fourth time, like so many others, I am deeply committed to this great city and am tied to its health and success. I would urge Your Honor that, instead of locking Irvin in

jail and he be a burden to our society, that the just and pragmatic outcome is to put him to work.  He is a natural teacher, a true mentor to young people with an interest in music and the arts. I have known this for years but have even seen it recently, when he has brought kids in their early twenties to sing and play in these performances at the Magnolia Mansion.   I understand he will owe a substantial amount of restitution no matter what the sentence you impart. I can tell you from what we have seen these past few months, the Magnolia venture if properly managed, could be a great start to accomplishing this much-needed repayment or at a minimum to provide Irvin the opportunity for community service. A benefit to our society and not a burden like we see so often in our overcrowded prisons. Let's rehabilitate Irvin and use his talents for service instead of destroying his and his family's  life.

 Perhaps more importantly, I know that Irvin is remorseful, that he is a different man than he was when he made these mistakes, and that he has a great desire to give much time to our community for the mistakes he made. I hope that you will give him the opportunity to do so and I hope that you can see the great qualities in the man that many of us see in Irvin.

Thank you for taking the time with my note and if you have any questions, please feel free to contact me.

 Sincerely,

 Stewart Juneau



# Office of the Sheriff
*Parish of Orleans ~ State of Louisiana*
## Marlin N. Gusman
*Sheriff*

September 29, 2021

Honorable Jay C. Zainey
United States District Court
Eastern District of Louisiana
500 Poydras Street, Room C455
New Orleans, LA 70130

Dear Judge Zainey,

I am writing regarding Irvin Mayfield, who will be sentenced in your court for the grave and reckless offenses he made while serving on the board of the New Orleans Library Foundation. I am certainly not writing to excuse those mistakes. To the contrary, I myself am angry with Irvin for the harm he caused to the Library and our City. That harm is real and caused great pain to many. Irvin must be held accountable for those mistakes, and he must work tirelessly to rectify them and provide appropriate restitution and service to our community in order to right his wrongs. I do not know the full facts of the case before you and will not try to comment on them. Of course, I fully respect any sentence you give to Irvin. However, I respectfully offer my thoughts to you, as someone who also is intimately involved in the criminal justice system. I understand the value of punishment that is both just and pragmatic, but, most importantly, punishment that focuses on making the victim—in this case, our city—whole. I also know Irvin and the good he can do for the community—and the true restitution he can provide us—if your sentence permits him to do so.

I have known Irvin Mayfield since he was a very young man. As I am sure you know, he is blessed with an amazing musical talent. However, I have witnessed that his talent alone is not what made Irvin one of the premier jazz musicians in the world. It was hard work, drive, and a love of music that has made him who he is today. I also know Irvin to be devoted to New Orleans. Unlike much of the talent before him, Irvin made the difficult decision to stay in New Orleans, rather than leave like so many musicians before him.

Our city has lost so much talent and potential in other ways: to drugs, crime, and of course, incarceration. Irvin knows this. Before Hurricane Katrina, he and I talked about the amount of raw musical talent that, unfortunately, is locked up in my jail. There is great untapped potential in these young men and women. Based on those conversations and research (after surveying the

residents and confirming that many were in their high school bands), we began discussing how to develop and implement a program within the jail to cultivate and even produce music inside the Orleans Parish Prison (now called the Orleans Justice Center) with Irvin volunteering his guidance and leadership. Katrina interrupted those early plans and sidelined the project, but we have continued to push ahead and are nearing a final plan that I believe could be a tremendous asset to our community. I hope that we can implement that plan as soon as possible, with Irvin taking the lead to see it through.

I have known Irvin Mayfield for a long time. Even though he is the youngest of five brothers, in many ways he has been the big brother, the responsible man of the family. I also personally know of Irvin's devotion to our city.

Despite his mistakes—which, again, are serious—I believe that he sincerely intends to redeem himself and repair the damage he caused to our city. Irvin has been arrogant in the past, which may explain why he is where he is now. The past few years have humbled Irvin tremendously.

I hope you will consider giving Irvin a sentence that allows him to pay restitution to the community he hurt. I hope you will consider requiring Irvin to implement a music education program in the Orleans Justice Center. We would, of course, conform to any federal guidelines that you prescribe. I think it could be of enormous benefit to the inmates in our custody and my employees as well. This would be a creative approach to reentry and rehabilitation that, ultimately, would require Irvin to use his talents for the good of our city and pay dividends in the long-term. I have always believed re-entry begins the first day a person enters our facility, and such a creative program could be of great value to all.

If you have any questions, thought or ideas, I would appreciate the opportunity to discuss this in further detail.

Sincerely,

Marlin N. Gusman
Sheriff

Michael Aiken

October 7, 2021

Honorable Jay Zainey
New Orleans, LA

Your Honor,

I am writing to provide a character reference for my good friend and business colleague, Irvin Mayfield.

I have known Irvin since I started helping manage his career in 2010, which led us on a journey of performance in some of the world's leading concert halls and festivals. Carnegie Hall itself cites one of Irvin's New Orleans Jazz Orchestra performances as one of their most seminal presentations and milestones in their support and celebration of black cultural contributions. The fact that I was a small part of that arc of history is among my proudest achievements.

As a world-renowned musician beloved by audiences and fellow musicians alike, Irvin has dedicated himself to the development and propagation of jazz and the culture of New Orleans and tirelessly promoted music education and programs for diverse and disenfranchised communities from Los Angeles to New Orleans, Moscow to Barbados. I have worked with no other artist who exceeds his commitment to the youth of these communities.

I hope that you take note of this letter as you consider Mr. Mayfield's sentencing. The ramifications of his actions, the pain it has caused to both him personally and the community he cherishes, along with the responsibility he accepts for his role in this matter, far exceed what could be accomplished with incarceration. Not only would incarceration be an absolute and irrevocable death sentence to his career, but it would eliminate any pathway to restitution, which should be considered paramount to a final resolution.

Due to Mr. Mayfield's indigent status, I have tried to assist him in booking performances. Despite an enviable career, I have been mostly unsuccessful in the U.S. and slightly more successful internationally, where his penchant for community service is especially recognized. For example, New York City's Public Theater/Joe's Pub (the birthplace of the Hamilton Broadway show) was thrilled to book a performance but subsequently determined that promoting a concert was impossible until the amicable resolution of this very matter. As a result, I'm confident that enabling Mr. Mayfield to accept his responsibility and focus on making amends for his actions fulfills justice while allowing him to pay his debt to society.

Sincerely,

Michael Aiken

Clara Hodges

Dear Judge Zainey:

I ask for your forgiveness, as I am unable to separate my faith and belief from this situation — not just because it concerns my family, but because my belief and faith inform all the decisions in my life. I don't know many of the details of the case my nephew, Irvin Mayfield, is facing, but I am convinced that anyone can see the good deeds far outweigh his mistakes on the balance scale. I've had the opportunity to discuss and pray with him, and I ask for your time in considering my thoughts:

I am a firm believer that prayer does solve all things, and the Bible teaches us about man's fall from grace and then, of course, his redemption. But in my eighty years on this planet, I have never witnessed a fall so far as when I watched my nephew from afar these recent years. The most difficult aspect of this wasn't watching Irvin sustain a public fall, but rather to watch him fight from the health, security, and stability of our family. And in his redemption, his greatest accomplishment has been to ward of suicidal thoughts and find positivity in the light of God.

Irvin is a special member of our family. He is the baby, born to my sister, who was also the baby of the family. For the entirety of his adult (and young adult) life, Irvin has always carried the majority of responsibilities for our family, and now, he is the sole source of support for his mother (my sister) Joyce, and his older brother, Ché, who is unable to live independently with developmental disabilities. As I am now living far from my hometown of New Orleans, taking care of my husband who is in his nineties, Irvin is my sole source of comfort and assurance that our most vulnerable family members are taken care of. I know the health of my sister and nephew is managed well, and that his young daughter has an incredible role model in her father.

I wanted to give you an honest sense of the type of man Irvin is, the private battles he has faced throughout this process. What he has done for our family, after being delivered one of the harshest public experiences in shame that an individual can go through, is nothing short of a miracle. I know that his prayer and faith has carried him through, and as he repents, he continues to fight for our family. The fight has been long, and it is not done. Irvin faced steep challenges in court when he fought to take control of his mother's affairs to ensure her wellbeing. And then did the same for his brother. And then still, he has navigated new challenges with the sudden death of his other brother, his mother's leg amputation, and Ché's new seizure condition. Irvin was the only one in the family who was able to do that, and he has done it under the pressure of a prison sentencing, uncertain if his efforts will be in vain.

It should also be stated that I am comforted, too, by the friendship that my nephew has in Ronald Markham. I've known Ronald as long as he and Irvin have been best friends in high school. They are good people, not examples of men who sin consciously, with evil and malice. They are like those of us who have lost our way on the path to the mountaintop, and need a second chance to serve their Higher Purpose. I ask you to make an example of Irvin — for those of God's children who persist and persevere in their duties to Him are given the chance to redeem themselves to continue their good works.

My nephew has many good works left in him — for our family and for New Orleans. He is much better served out in the world than in a prison cell. I humbly pray and ask that you find a way to allow him to serve, repent, and redeem himself as he continues to carry the heavy weight of our family.

Thank you for your time and consideration.
God Bless,
Clara Hodges

Anthony Foxx

October 12, 2021

The Honorable Jay Zainey
U.S. District Court for the Eastern District of Louisiana
500 Poydras Street
Room C455
New Orleans, LA 70130

Dear Judge Zainey:

I write regarding the sentencing of Irvin Mayfield, Jr. (referred to hereafter as "Irvin").

You are more intimately familiar with the facts of the matter before you than I am. However, I
know Irvin well, as the following passages will reveal, and I can tell you with no reservations
that he is deeply committed to turning this low point in his life into a positive for others.

I met Irvin during a visit to New Orleans in 1996. I have thus known him for 25 years. I had just
taken the bar examination. Irvin was 18 years old, studying music at the University of New
Orleans and sometimes performed in local venues, which is where I found him. His talent was
apparent to anyone who had a chance to observe him. What was less apparent was his
intellectual curiosity, his ability to lift others and to serve the public.

Twenty-five years ago, I wanted to learn about the trumpet and jazz music in general, and it
was not long before I found sitting with Irvin for hours at his parents' modest home near Elysian
Fields. He had – and continues to have – an irrepressible joie de vivre, perhaps hewn from the
community of New Orleans, a deep faith in God and the struggles of his parents  to give him a
better life. Such is not to be confused with arrogance. It is a resilience in the face of adversity
and a manner of enduring that which comes to us without losing one's spirit. Like the city itself,
Irvin weathered so much in his early life that fueled him to learn his craft, to reach his growing
edge as a creative presence and to help further New Orleans' heritage as America's cultural
heartbeat. It took a lot of courage and belief in his own ability to emerge as he did.

As Irvin shared with me his knowledge of music, I shared with him my knowledge of the liberal
arts. It would not have been uncommon for me to share John Locke's  Second Treatise of
Government or Thomas Hobbes' Leviathan with Irvin and later quiz him about what he had
read. Over the years, I must have sent him twenty or more book recommendations – and he

always read them and was ready to discuss each one afterwards. While he carries himself with a light air, it masks an uncommon depth.

I left New Orleans that summer to start a law practice, and Irvin became one of my first clients as I represented him and managed his career briefly (until discovering that he would be better served in the latter category by someone with real skill in the latter category). I watched him deal with the roller-coaster of attempting to translate a passion for music into a career. He initially pushed unsuccessfully to sign with a major record label. Bookers at venues in New York offered to schedule him, and, just as quickly, would not return calls. It was a slow, up-and-down time for him. Through it all, he maintained his good humor and countenance. Perhaps to the outside world, his career appeared to take off suddenly, but I can attest that it was built slowly over many years.

I continued to keep up with him over the years. We celebrated his first record deal. When he won a Grammy Award, I was both happy for him and extremely proud. it only confirmed the vast talent I saw the very first time I witnessed his performance. Irvin could have well focused on individual career aspirations. Instead, he dedicated time to serving our country and the Greater New Orleans community. Two U.S. Presidents, each representing a different political party, appointed him to the National Endowment for the Arts. Moreover, I have personally witnessed numerous school workshops and clinics Irvin has led to keep America's classical music tradition alive and growing.

Regarding the tragic turn his life has taken, Irvin has admitted to wrongdoing. This admission required courage and humility of him. I know he is committed to turning his mistake into an object lesson for others. That's something unique about this matter: Irvin has infinite capacity to turn this experience into a positive for others. What is more, he wants to do that.

Irvin has experienced a dramatic fall from grace. While it will likely follow him for the rest of his life, it does not need to define him. He has lost his livelihood. I am unsure whether he will ever play the trumpet for the public's enjoyment again. The law does not recognize ignorance as an excuse, but I suspect that he has learned in the harshest way possible to take much greater care with resources and the public trust in the future.

Your Honor, you have enormous power to determine Irvin's immediate future. I have great confidence that you will weigh his life, his long record of service to our country and the New Orleans community, his long record of good citizenship prior to the events that have given rise to this matter, his contrition as evidenced by his plea and his capacity to turn this tragic moment in his life into a blessing for other people. I ask that you consider alternatives to prison in his case.

Thank you for your consideration of this and many other letters of support for Irvin. Please do not hesitate to contact me if you have any questions or concerns.

Most sincerely,

Anthony Foxx

**From:** Rebecca Hamilton
**Date:** May 23, 2018 at 12:01:52 PM CDT

**Subject: Hey you**

Someone brought your name up the other day at some Political thing and I interrupted them to say that after the storms of 2005 it was all hands on deck doing anything and everything we could to get the libraries back online and to raise money and to get the staff back to the state and to start recovery and that you were invaluable working with my office to ensure that we got the visibility we needed and could tell our story to national funders and that I saw you worked tirelessly on behalf of Louisiana, New Orleans, and the New Orleans public library even as you were dealing with the loss of your father in the most tragic way. And then I told him that you were my friend and I must be intimidating or something because they shut the hell up after that.


Rebecca Hamilton, MLIS

Judge Jay Zainey
United States District Court

Dear Judge,
        I have known and taken care of Mrs. Joyce Mayfield for over a decade. She has had longstanding diabetes mellitus, advanced coronary artery disease having had numerous stent procedures, severe peripheral vascular disease having had balloon catheter procedure of her legs and then eventually an amputation, and has had numerous strokes. The strokes have resulted in a severe decline in her intellectual state. She is incapable of an independent existence. She needs a 24 hours a day care, with at least one attendant. She has, however, been remarkably well taken care of in the last several months, when she has lived with and been taken care of by her son, Irvin.
        I have also taken care of Mrs. Mayfield's son and ward, Che Reed. He has autism, has had an abscess in his brain and a seizure disorder. Since birth, he has lived with and been taken care of by his mother, and when she became ill, the responsibility of his care fell upon his brother Irvin. He too has been thriving in his present environment, living with and being nurtured by Irvin.
        Both, Mrs. Mayfield and Che owe their survival and their present fragile but stable existence to Irvin. If Irvin was to be sent away, and not continue to be able to live with and care for his mother and brother, it would be extremely unfortunate.
        I will be happy to discuss details of their health care and why it was so important for me to write you this letter.
        Sincerely,
                Siddharth Bhansali, M.D.

LAW OFFICES
# RICHARD E. ANDERSON
Attorney at Law

October 7, 2021

Honorable Jay C. Zainey
United States District Court, EDLA Section "A"
500 Poydras Street, Room C455
New Orleans, LA 70130

## BY HAND

Re: *United States v. Irvin Mayfield*, 2:17-cr-00241, EDLA, Section "A"

Dear Honorable Jay C. Zainey:

I am writing this letter to offer my insights on Irvin Mayfield II, in order to assist the Court in deciding an appropriate punishment for his wrongdoing. I have served as Mr. Mayfield's tax and family law attorney for over four years. In doing so, I also have offered him mentorship and have gotten to know both Mr. Mayfield and his family well.[1]

I first encountered Mr. Mayfield through his defense attorney Claude Kelly, who is my brother-in-law. (We married sisters.) Because Claude and I are both attorneys, when we see each at family functions, we spend time discussing what is going on in our respective practices. At a family crawfish boil in April 2018, Claude told me that he was representing Mr. Mayfield, a famous jazz trumpeter. At that time, I had not heard of Mr. Mayfield, and therefore, was unaware of his legal problems.

Claude told me that Mr. Mayfield was looking for someone to prepare his personal and S-Corp federal income tax returns for 2017 and asked me if I was interested. I told

---

[1] I was born in Denver and graduated from the University of Colorado in 1974. Through Army ROTC, I received a commission as a 2LT in the Army. I moved to New Orleans in 1974 to attend law school graduating from Tulane Law School in 1977. I fulfilled my ROTC scholarship obligation to the Army with four years of active duty as a Captain in the Judge Advocate General's Corps from 1977-1981. Thereafter, I attended NYU using my "WWII GI Bill" and graduated with a LL.M. in taxation in 1982. I returned to New Orleans and spent ten years with Liskow & Liskow (five years as an associate and five years as a partner) practicing in the areas of tax, general business, banking and complex commercial litigation. In 1994, I went out on my own as a solo. My practice consists of tax, general business, family law, and succession matters and a trial practice involving commercial, legal malpractice and Section 1983 and discrimination matters.

Claude have Mr. Mayfield call me to set up a consultation. Shortly thereafter, Mr. Mayfield called me to set an appointment, and then he came to my office to discuss engaging me. We discussed the tax services he needed, and I agreed to prepare his returns, which were routine. I continued to file his returns in the years thereafter as well.

My first meeting with Mr. Mayfield lasted over five hours and we developed a friendship based on our mutual Christian faith. We also spent time discussing his pending criminal charges. I offered Mr. Mayfield general advice regarding his case based on my experience as both a defense counsel and prosecutor.[2]

In July 2018, Mr. Mayfield contacted me regarding a grave "personal problem" he was having within his family. Mr. Mayfield requested that I represent him in having his mother, Joyce Reed-Mayfield, interdicted, which I agreed to do.

Mr. Mayfield's oldest brother had abruptly removed their mother from the family home and moved her to small apartment in Chalmette, Louisiana. This disrupted his mother's life and endangered her wellbeing. It also disrupted and the life and wellbeing of his older brother Ché Reed, who is autistic and used to living with their mother.[3]

With Mr. Mayfield's permission, I have set forth below a description of his family and the interdiction of his mother which are tied together, and which fortunately had a happy conclusion for his mother and his brother Mr. Reed. I felt it necessary to provide this detail because it shows how Mr. Mayfield was raised and his devotion to his family (as one should have) during a tumultuous period of his life.

## I. RELEVANT DESCRIPTION OF IRVIN MAYFIELD'S FAMILY

**A. Joyce Reed-Mayfield**. Joyce Reed-Mayfield was born on August 4, 1947, in Independence, Louisiana. She is 74 years old. Ms. Reed-Mayfield lived most of her life in New Orleans. She was married two times, first to, Woodrow A. Reed, Jr. from whom she was divorced, second to Irvin Mayfield, Sr., who predeceased her. As detailed below, Ms. Reed-Mayfield is a remarkable woman.

Mr. Mayfield's father was Irvin Mayfield, Sr. He served in the Army during the Vietnam War and was a decorated combat veteran receiving the Purple Heart. After the Vietnam War, Mr. Mayfield, Sr. worked at the United State Post Office for many years and retired with full benefits. Mr. Mayfield, Sr. died in a Hurricane Katrina related drowning.

Ms. Reed-Mayfield had five children: Woodrow Reed, Terrance Reed, who passed away last year at the age of 53 years old; Roemalis Reed, Ché Reed, and Irvin Mayfield.

---

[2] I have significant criminal trial experience from my service in the Army both as a defense counsel and the prosecutor for my jurisdiction, the John F. Kennedy Center for Military Assistance (known as the "Green Berets"), at Fort Bragg, North Carolina. (Please note, while I served with Green Berets, I was not a Green Beret.)

[3] Ché Reed was born on June 17, 1976. He was diagnosed with Level 3 autism (severe) when he was a child.

After having her five children, Ms. Reed-Mayfield obtained her teaching degree from the University of New Orleans and a certificate in Early Childhood Development from Tulane University. For many years, she taught at Lorraine Hansberry Elementary School. Ms. Reed-Mayfield retired from teaching in 2011. Due to her exemplary teaching service to the community, Ms. Reed-Mayfield is a "teaching legend" beloved by the thousands of students she taught.

Ms. Reed-Mayfield is domiciled in Orleans Parish and lived in the house she owned located at 4925 Music Street, New Orleans, LA 70122 (the "Music Street Property"). She bought the Music Street Property in 1991, which is the family home.

From her working endeavors, Ms. Reed-Mayfield receives several pensions. She owns immovable property in Orleans Parish other than the Music Street Property. She also receives a "survivor" pension from the United States Postal Service from Mr. Mayfield, Sr.'s service.

**B. Ms. Reed-Mayfield's Medical Conditions**. Over seven years ago, Siddharth K. Bhansali, M.D. began treating Ms. Reed-Mayfield for her various medical issues. Dr. Bhansali has over 44 years of experience. He is Board Certified in Cardiovascular Disease and Internal Medicine and affiliated with Touro Infirmary and Ochsner Medical Center.

Dr. Bhansali initially treated Ms. Reed-Mayfield for problems relating to heart disease. Ultimately, Dr. Bhansali placed several stents in her arteries around her heart. Dr. Bhansali also treated her for Type 2 Diabetes.

Over five ago, Dr. Bhansali also treated Ms. Reed-Mayfield for a Cerebro-Vascular Accident ("CVA") commonly referred to as a stroke. In August 2017, Ms. Reed-Mayfield had another stroke (the "Second CVA"), more serious than the previous one. Dr. Bhansali also treated her for the Second CVA.

After examining her on several occasions, Dr. Bhansali concluded that the Second CVA caused irreparable damage to Ms. Reed-Mayfield's brain. This prevented her from tending to her own business affairs and diminished her ability to care for herself. Thus, from the time of the Second CVA, Dr. Bhansali found that Ms. Reed-Mayfield was not of sound mind, and incompetent to make decisions about her personal care and finances. Additionally, Ms. Reed-Mayfield is incontinent and has difficulty walking.

In Dr. Bhansali's opinion, due to her age, and her mental state, it was unlikely that Ms. Reed-Mayfield's condition would significantly improve. Consequently, Dr. Bhansali informed Mr. Mayfield, who in turn informed his aunt and "family elder," Clara M. Hollman-Hodges ("Aunt Clara"), Ms. Reed-Mayfield's 81-year-old sister,[4] that Ms. Reed-

---

[4] Ms. Hodges was born in New Orleans. She was employed at the New Orleans Home and Rehabilitation Center (now named the John J. Hainkel, Jr. Rehabilitation Center) for a period of over thirty-two years in the Food Service Department, the last ten years as the Executive Director. She retired in 2004 and moved to South Bend, Indiana with her husband, who is the Pastor of Christ Temple Church of God. She is the First Lady of the Church.

Mayfield needed to receive in-patient rehabilitative therapy at a hospital and evaluated for the possibility for being placed in an assisted living facility to receive appropriate care. **B. Ché Reed**. Ché Reed is eighteen months older that Mr. Mayfield. His severity of autism spectrum disorder is Level 3. Notwithstanding, Mr. Reed is a talented saxophone player. He graduated from the New Orleans Center for Creative Arts (NOCCA) and attended college.

I meet with Mr. Reed few times at my office along with Mr. Mayfield and a number of times socially at Mr. Mayfield's house and other settings. Through this interaction, Mr. Reed and I are friends, and I can attest to the fact that he "plays a mean sax."

For most of his adult life, Mr. Reed lived with his mother, Ms. Reed-Mayfield. They had and now have again a close and loving relationship. Moreover, due to Ms. Reed-Mayfield's academic training and experience, her special caring for Mr. Reed gave him the opportunity to live a fulfilling life in the outside world. Mr. Mayfield also had and now have again a close and loving relationship with his mother, Ms. Reed-Mayfield. She often attended his music performance.

Mr. Mayfield and Mr. Reed also have a close and loving relationship as brothers and musicians often jamming together at home and performing together at music venues. Currently, Ms. Reed-Mayfield and Mr. Reed live with Mr. Mayfield and Mr. Mayfield's fiancée.

## II. THE INTERDICTION OF MS. REED-MAYFIELD

**A. Relevant Pre-Interdiction Facts**. Until spring of 2018, Ms. Reed-Mayfield lived in the Music Street Property with her son, Mr. Reed. Mr. Mayfield and Ms. Reed-Mayfield's family and friends assisted in her and Mr. Reed's caretaking. Without consulting with her family, Ms. Reed-Mayfield's oldest son, Woodrow A. Reed, III ("Woodrow Reed"),[5] who was 53 years old at the time removed her from the Music Street Property.

Woodrow Reed brought Ms. Reed-Mayfield to live with him and his wife at 3316 Delambert Street, Apt. #6, Chalmette, LA 70043 (the "Chalmette Apartment").[6] Mr. Reed stayed at the Music Street Property where his older brother, Terrance Reed, also lived.

In July 2018, Mr. Mayfield became aware of facts that Woodrow Reed was not properly caring for their mother Ms. Reed-Mayfield. He also became aware that it was beyond Terrance Reed's capabilities to take of Mr. Reed's needs.

Due to the lack of proper care and the stress on not living with his mother, Mr. Reed had a serious infection, which required hospitalization and surgery. Mr. Mayfield was personally involved in his brother's post-operative care. Armed with these facts, Mr. Mayfield brought Mr. Reed to live with him and his then significant other in the Bywater.

---

[5] Woodrow Reed is a convicted felon relating to his long history of drug abuse.
[6] The Chalmette Apartment is in a rundown apartment complex in Chalmette. It is an upper and consists of two bedrooms and one bath with only 671 square feet living space.

At this time, Mr. Mayfield was personally involved in his brother's post-operative care. As to Ms. Reed-Mayfield's situation, his brother Woodrow Reed refused to allow Mr. Mayfield access to their mother.

For example, after Aunt Clara informed Woodrow Reed regarding Dr. Bhansali's opinion that Ms. Reed-Mayfield needed immediate in-patient evaluation, he refused to consider that course of action. Based on a power of attorney he obtained from Ms. Reed-Mayfield during her hospital stay for the Second CVA, he insisted he knew what was best for his mother.

Additionally, since moving her from the Music Street Property to the Chalmette Apartment, Woodrow Reed isolated Ms. Reed-Mayfield from her family and friends by restricting their visitation and shutting off her iPhone. Woodrow Reed was also using Ms. Reed-Mayfield's money from her retirement funds to pay his own personal expenses. He even sold off her appliances from the Music Street Property.

On two occasions, Woodrow Reed had to borrow money from Mr. Mayfield to pay for Ms. Reed-Mayfield's insulin. With his former and continued personal problems Woodrow Reed was an unsuitable caretaker for his mother.

**B. The Interdiction**. Based on the above information, Mr. Mayfield asked me if I would represent him in the interdiction of his mother. Because of the serious nature of an interdiction, I had an independent meeting with Aunt Clara at my office to obtain her opinion founded, in part, by her visit with Ms. Reed-Mayfield and Woodrow Reed at the Chalmette Apartment. I also had a telephone conference with Ms. Reed-Mayfield's treating physician Dr. Bhansali.

Both Aunt Clara and Dr. Bhansali confirmed that Ms. Reed-Mayfield needed removed from Woodrow Reed's "custody" for her health and well-being. Armed with the information, Mr. Mayfield presented me sufficient evidence to file a petition for interdiction on his behalf.[7]

I began putting together the petition for interdiction, which included requests for a temporary, preliminary and judgment of full interdiction (the "Petition for Interdiction"). The Petition for Interdiction requested that the Court appoint Mr. Mayfield as curator for his mother.

The attorney I share offices with, Dayal Reddy, assisted me in preparing and filing the petition, which occurred on August 30, 2018. The matter is captioned *In Re: Interdiction of Joyce Reed- Mayfield,* Case No. 2018-8698, Civil District Court, Parish of Orleans, State of Louisiana, Div. "F-7."

After filing the petition, the Court granted the temporary full interdiction and appointed Mr. Mayfield as curator. The Court also appointed Jane Booth to represent Ms. Reed-Mayfield. After Ms. Booth met with Woodrow Reed and Ms. Reed-Mayfield at the

---

[7] From recent work on another case, I was proficient in the process of interdicting an elderly person for their protection.

Chalmette Apartment, she reported to the Court that Ms. Reed-Mayfield required a full interdiction, which subsequently occurred by a consent judgment.

### III. POST-INTERDICTION ACTIONS

After her interdiction, Mr. Mayfield's brother, Roemalis Reed, and his wife, a home-health care professional took care of Ms. Reed-Mayfield at their house. When this arrangement proved too stressful for all parties, in 2020, Mr. Mayfield moved Ms. Reed-Mayfield into his house. Mr. Mayfield arranged for a "sitter" for Ms. Reed-Mayfield and ensures that shas he has a proper diet and medical care. As her curator, Mr. Mayfield manages Ms. Reed-Mayfield's financial affairs. Mr. Mayfield's fiancée also assists him in the care of Ms. Reed-Mayfield.

With this occurrence, Mr. Mayfield, his brother, Mr. Reed, and his mother, Ms. Reed-Mayfield, were reunited under one roof as a family. Additionally, in 2021, Mr. Mayfield entered in a consent judgment with his former significant other to have joint custody of their daughter, who is five years. This provides Ms. Reed-Mayfield access to her granddaughter and Mr. Reed access to his niece.

In social settings, I have personally observed the interaction of Mr. Mayfield, Ms. Reed-Mayfield, Mr. Reed, Mr. Mayfield's daughter and Mr. Mayfield's fiancée. The presence of joy and love permeates the air. Ms. Reed-Mayfield is particularly moved when she is listening to her sons playing music together, her body moving to rhythm of the music.

Recently, I had the chance to talk with Ms. Reed-Mayfield before one of Mr. Mayfield's music performances. This was first time that she spoke to me. While our conversation was brief, she was very engaging and animated with life.

Mr. Reed is also a beneficiary of having his family reunited. With help from Mr. Mayfield's fiancée, Mr. Mayfield also ensures that Mr. Reed has a proper diet and medical care. Mr. Mayfield also assists Mr. Reed in dealing with his financial matters. My interactions with Mr. Reed show he is thriving in his present environment. On a nice day, my wife often sees Mr. Reed enjoying his walks on Magazine Street.

### IV. CONCLUSION

We as humans often find ourselves in the most unexpected situations. A situation may occur that when we arrive at its threshold it makes one doubt about being in that situation. Running and hiding from a situation we fear is an easy response, but to stay and face the situation is how one attains real growth both spiritually and physically. To find oneself in these untimely situations and realizing one can overcome them is our God-given strength that resides in each of us waiting for the day to be used.

In the three-plus years I have known Mr. Mayfield, I have seen the transformation of a man. When I first meet Mr. Mayfield, he suffered from a bit too much hubris. In Mr. Mayfield's transformation two situations arose simultaneously, the federal indictment

and prosecution and the destruction of his family. Each situation tested Mr. Mayfield emotionally and physically.

However, Mr. Mayfield was exactly where he was supposed to be at that time in his life. He faced these twin perils with the strength of his Christian faith, which became stronger, not fear. He realized his failures and shortcomings were lessons not punishment.

Mr. Mayfield faced the destruction of his family by putting it back together to the benefit his mother, brother Ché and himself. At same time, dealing with his prosecution by recognizing his wrongdoing and deserving the sentence the Court imposes.

Dear Judge Zainey,

My name is Franklin Davis IV, known as "Berkley the Artist" professionally. I am an Instructor of Contemporary Ensemble and Voice at the Loyola University School of Music. I have known Ronald Markham most of my life (we grew up together), and I have known Irvin Mayfield for over 25 years through Ronald. Both Ronald and Irvin are known as exceptional musicians, but I personally know them as even better teachers and mentors. I have seen their dedication to that aspect of their musical life sharpen in recent years through the creation of the Blackhouse studio, which serves young musicians seeking guidance as they make music and navigate the difficult process of turning a passion for music into a sustainable career. My students and the rest of the young musical community in New Orleans have benefited tremendously as a result of Irvin and Ronald's founding of Blackhouse.

I hoped that I might be able to give you a glimpse of that side of Ronald and Irvin, which they have kept from public view and may go overlooked. I also wanted to relay to you the transformation I have seen in both men as they have prioritized this project. Ronald and Irvin are always patient and thoughtful with young musicians, and they clearly relish their roles of teachers. It appears that they have learned that, at this stage in their careers, they now can be more fulfilled from helping launch young, musical talent, than from promoting and elevating their own performances and careers. Recently, they have even promoted some of my students in free performances at the Magnolia Mansion, all in an effort to help them grow as young artists. For years, Ronald and Irvin were friends to me and a great source of inspiration. Now they are the same to my students.

I enjoy teaching at Loyola University and love the opportunity to meet and help young talent. I want you to know of the valuable mentorship Irvin and Ronald have provided to our school's students. These two men, until their horrible mistakes years ago, stood as pillars of our community and as a personal inspiration to me. Since their indictment, they have worked to continue to serve the community. My personal feeling is that incarceration would be a waste of what they can do for our community and a missed opportunity. As a Black Loyola professor who teaches young Black students, compelled service for our city instead of jail, particularly for black men who pose

no threat, would be best for our community.

Thank you for taking the time to hear my thoughts on this matter. Certainly, I understand that Irvin and Ronald made inexcusable and selfish mistakes a number of years ago. As their friend, I know they know that too. However, I hope you will consider a path that benefits our community. I know that my students would suffer a great loss if Irvin and Ronald are incarcerated, and I know our community would gain great benefits if they are punished in a way that compels them to put their talents to work.

The Honorable Jay C. Zainey
United States District Court
Eastern District of Louisiana
500 Poydras Street, Room C455
New Orleans, La. 70130

Dear Judge Zainey:

My name is Dan Packer. I am retired after having served as CEO of Entergy New Orleans and as Chairman of the New Orleans Aviation Board. I also served on the Board of the New Orleans Jazz Orchestra from 2006 to 2015. I am writing on behalf of Irvin Mayfield.

The first time I met Irvin, he was speaking at a symposium for a Teen Summit Conference. I had the opportunity to get to know him well after that, and when I was Chairman of the Board of the New Orleans Chamber of Commerce, I selected Irvin to chair the Education Committee, which he did for four years. With a goal of growing support in the business community for education, he raised more than seven million dollars, which in turn supported more than twenty underprivileged schools.

While I was Chairman of the New Orleans Aviation Board and a member of the Board of NOJO, I observed Irvin in his role as the head of the New Orleans Library Foundation. He was enthusiastic about developing and revitalizing the library system, and embraced the library's post-Katrina development plan, which focused on the system's 20-year capital rebuilding plan to address the needs of the city's present and future neighborhoods. Irvin engaged consultants to look at the library's human resources, the most notable being the Information Technology Director. He promoted the library's embrace of New Orleans' culture by increasing musical performances throughout the system, and he also guided the establishment of the Southern Food and Beverage Museum's culinary collections at the Main Library. Users continue to benefit from the investment in the library's collection and technology during his tenure.

All of that being said, I am saddened and heartbroken by the turn of events with the case before you. There are no excuses. They have admitted to a crime, accepted responsibility, and will be punished. I also feel some collective guilt on the part of the Boards of both NOJO and NOPLF. There were some very talented people on those boards: lawyers, businessmen, entrepreneurs. We all had a duty, which we clearly did not fulfill.

Irvin was a young artist and a talented man with a big-picture vision for what both NOJO and the library system could do to benefit the community. Like the other board members, I shared and was inspired by that vision. We also all knew of the collaboration between NOJO and NOPLF, and Irvin's ideas for how those two organizations could support each other's missions. In fact, the NOPLF Board was at the opening of the Jazz Market, and NOPLF has a plaque on the building itself, to indicate the Jazz Market's connection to the library system.

I do not say that to minimize what happened. I merely think it is important to impress on your honor and be honest that NOPLF funds going to places like NOJO was not, in and of itself, a bad thing or outside of what both organizations and their boards envisioned. I think that is an important correction of what has been reported in the press. What went awry (which again is inexcusable) is how that was

done, which was unethical and ultimately violated federal law. I know that Irvin feels great shame and guilt over how he took this too far and was too arrogant to consider that rules applied to his conduct, even if he felt that the ends justified the means and was eager to just get things done and carry out his vision.

In the end, I am filled with great sadness that this ended where it did and great fear that these two very talented, ultimately well-meaning, and non-dangerous individuals will receive unnecessary prison terms as a result. Based on what I witnessed personally, I do not believe that is a proportional response to what happened and is not necessary to make this right. I know Irvin and Ronald will pay a great price for this and already have done so for years now, but to a degree, there is collective guilt. They did wrong, but, with proper guidance and oversight, such a grand institution would have been built in Central City, and we would all be proud. This did not need to happen.

I have kept up with Irvin since the indictment. I can sense a new man, a more mature humbled man. He dearly loves this city. I hope you give him the opportunity to make it right, consider why this happened, and that this was not driven by pure greed, but carelessness and arrogance of a young man who no longer exists. Irvin is not the same person who will stand before you to receive a sentence as he was when he made these serious mistakes.

Thank you for considering my thoughts,

Dan Packer

# REGISTER | LETT LLP
### ATTORNEYS AND COUNSELORS AT LAW

October 28, 2021

The Honorable Jay C. Zainey
United States District Court
Eastern District of Louisiana
500 Poydras Street
Room C455
New Orleans, LA  70130

Re:   Prayer for Leniency in Support of Ronald Markham and Irvin Mayfield

Dear Judge Zainey:

My name is Eric L. Register, and I now respectfully provide this correspondence for the Court's consideration in sentencing Ronald Markham and Irvin Mayfield. I am a litigator practicing in Atlanta, Georgia, where I have resided for the past twenty years. Prior to moving to Atlanta in 2001, I lived in New Orleans and practiced with King, LeBlanc and Bland, as well as Abbott, Simses, Knister & Kuchler. As a trumpet player, I was immediately impressed with Ronald's and Irvin's musical talents upon seeing them perform live. Before long I was a trumpet student of Irvin's. My visits to their shared apartment for lessons would often evolve into simply hanging out with the guys. Once I left New Orleans and established my own practice in Atlanta, I was able to expand our relationship to the professional realm. I have remained Irvin's personal attorney since about 2001, and I am proud to have assisted with the creation of the New Orleans Jazz Orchestra, having assisted with establishing the entity and securing its 501(c)(3) status many, many years ago. Although my connection with NOJO ended more than a decade ago, I have remained proud of the institution Irvin and Ronald built and I was heart-broken to hear of the criminal allegations, knowing that no matter what the outcome, their reputations and NOJO's would be tarnished forever.  Nonetheless, I remain proud to call both of them good friends.

When I first met Ronald and Irvin, they were still young men in their very early twenties. To be sure, Ronald was still working to complete his engineering degree while at the same time performing as the Irvin Mayfield Quintet's pianist.  Although I was seven years their senior and three years into my career as an attorney, I admired their drive and I was inspired by the dedication with which they pursued their craft. I was also impressed with their undying loyalty to the City of New Orleans—which has remained intact despite some difficult times, such as the death of Irvin's father in the flooding caused by Katrina. Rather than becoming angry at the City for its failures, Irvin redoubled his efforts as an

The Hon. Jay C. Zainey
October 28, 2021

ambassador. He did this because he is patently aware of the challenges that face the average child born in New Orleans and genuinely seeks to improve their chances of succeeding in their native city. Similarly, despite coming from a model family of two professional parents, and with all of his talent, Ronald has never been boastful or arrogant; rather, he has always been motivated by the same desire to push the art form of jazz and, concurrently, advance and celebrate the City of New Orleans for the benefit of all of its residents.

As counsel and as a friend, I know these two men intimately. I have had many opportunities to observe their respective character in the midst of difficult negotiations and in navigating both personal and business disputes. I have never witnessed either Ronald or Irvin attempt to take advantage of anyone, even when the opportunity presented itself and doing so was a legitimate option. While neither spends a lot of time talking about religion, I know each to be deeply faithful and driven to serve and please a higher power than himself. They accept responsibility for their mistakes and never attempt to blame others for their failures. Based on my observations, they want to be fair to everyone that crosses their paths, from musicians in the bandstand whom they hire to the man on the street.

If Ronald and Irvin had not impressed me with their character and personalities—in addition to their musical prowess—I would have dropped them from my rolls as clients and allowed our relationship to fade away years ago. But they have impressed me. This includes the manner in which they have handled the present criminal proceedings. At this point, their reputations have indeed suffered severely. I do not know if they will ever rebound to their prior status, but I suspect that they will remain loyal to the City of New Orleans and continue fighting to improve the City for all of its residents. For this reason, it is my humble opinion that locking them away will serve nobody's interests. The City has benefited from these two staying in New Orleans and working to build institutions that create jobs, spread the gospel of jazz and New Orleans culture, and generally help the City put its best foot forward. As the post-Katrina New Orleans culture is solidified, these types of loyal and dedicated natives are precisely what the City needs, now more than ever. In short, I believe these gentlemen deserve leniency and I pray that this Honorable Court agrees.

Please feel free to contact me directly at any time if the Court has need for any additional information regarding this matter. I can always be reached on my cell phone, 404-372-1155. I thank the Court in advance for its consideration.

Best regards,

Eric L. Register, Esq.

Dear Judge Zainey,

My name is Jessica Holtzman. I'm a Tulane University alumnus, local marketing professional, and Uptown property owner; and I'm proud to call New Orleans my home. Over the years I've known Irvin Mayfield in various capacities – as a musician, a mentor, a boss, and as a dear friend. I felt compelled to write you this letter on his behalf.

I first met Irvin more than nine years ago in January 2012 while completing an unpaid internship with the New Orleans Jazz Orchestra (N.O.J.O.) where he served as Founder and Artistic Director. I spent a year working with the organization; first as their Marketing and Communications Coordinator and then as the Merchandise and Social Media Coordinator. During that time, I regularly engaged with Irvin and the executive team during weekly meetings and performances. I watched Irvin serve as a valued community member, respected business leader, and man of strong moral character. My internship with Irvin and the N.O.J.O. was so impactful that I often refer to it as the catalyst to my interest in the entertainment industry and springboard to my marketing career. I feel incredibly lucky that my relationship with Irvin didn't end with my internship, and that he's remained a trusted mentor and friend throughout the years.

Since 2012, I've seen Irvin expand the worldview of university students through engaging coursework and lectures, give back to community members and invite them into his home for intimate concerts with living legends, change the lives of underserved youth with music lessons and opportunities to travel and play in front of audiences, and even give Stevie Wonder a stage when his Jazz Fest set was rained out in 2016. I'm forever grateful to him for giving me a seat at the table – both figuratively, when he took on an inexperienced intern and allowed her to learn from himself, Marriott hotel executives, and members of the CVB and NOMTC; and literally, when during one of our first interactions, he invited that same nobody to dinner with a group of highly influential New Orleanians and insisted she bring out-of-town friends so they could properly experience the city.

Irvin is an asset to the community and continues to touch the lives of many on a daily basis, including visitors who bring tourism revenue to the city of New Orleans. Additionally, he serves as the primary caretaker of his disabled mother and brother, and loving father to his young daughter. I've personally heard him discuss the anxiety and depression he's faced due to this case and believe remorse for his prior actions has led to positive change. For these reasons, and because of the exemplary character I've described above, I ask that you do not impose a jail sentence in his case.

Respectfully,

*Jessica Holtzman*

Jessica Holtzman

Your Honor:

I would like to clarify and verify one fallacy that has been written about in several news stories pertaining to the defendant at hand, Irvin Mayfield. One of the most challenging aspects for me to witness in the news is the blatantly bad storytelling about Irvin's spending behavior. His acts of generosity have been wrongly twisted and re-defined as superfluous, materialistic, and ego-centered behavior; I thank you in advance for your time in considering my following words and personal experience:

As a staff member of the New Orleans Jazz Orchestra, I was in charge of spending funds on behalf of Irvin for gifts during the Holidays. Irvin's gift-giving was a well-known and beloved tradition that all staff members had heard about for well over a decade. The key element of the tradition, though, was the necessary volunteer efforts. One of the unspoken truths when working at the Jazz Orchestra was that if Irvin Mayfield cared about an organization -- whether it was one he spearheaded or not -- you were also expected to care. You were expected to volunteer your time, talent, and energy through supportive events, performances, and building whatever infrastructure was needed for the success of the cause. And this level of dedication demanded long hours -- weekends, many nights, and very early mornings.

Now, the way Irvin rewarded his staff for this type of service was to allow each of them to pick a gift of their choice from Saks Fifth Avenue. For many of us, myself included, this was our first time inside a store like Saks. For some of us who were making a non-profit wage of $25,000 / year or less, this opportunity was more than a blessing, it was a true joy. And this can be verified by any staff member who worked at NOJO.  I stand by the fact that this was an incredibly generous act, not just in my tenure but over the decade he implemented it at NOJO. And of course the only two team members who never received a gift for their services were Irvin Mayfield and Ronald Markham.

The only voice that has been heard on this matter has been the negative storytelling of the media. This is in part due to fear mongering. Anyone who has spoken with the prosecution has been given an unfair feeling -- that to say anything opposed to the narrative presented in these hateful stories is unjust and "against the welfare of children and libraries."

And while I'm glad to have this opportunity to participate in righting an egregiously wrong story, it should be noted that even writing something like this in this current environment takes courage. I know that Your Honor recognizes this, and I'm eager and hopeful that you will give my former bosses the opportunity to get this behind them, to create more magic for children and for the community.

With faith,
Paul Washington

Your Honor, Judge Zainey:

I thank you for your time in considering the following thoughts, as Your Honor makes his judgement regarding my cousin Irvin Mayfield's upcoming sentencing --

I've spent my entire adult career following in the footsteps of my aunt Joyce, Irvin's mother. She was an inspiration -- a young woman who graduated from UNO with her Masters in Education while raising four children (and going into labor with Irvin, her fifth and final, on graduation day). I can now proudly say that I, like my aunt Joyce, am an elementary school teacher in Orleans Parish and carry her legacy forward.

But hands-down, the torch-bearer and forever patriarch of our family is Irvin.

In our family, we are accustomed to people making mistakes. The children and parents alike have always looked to Irvin for guidance, financial assistance, and emotional support when they need second-third-and-fourth chances. It is Irvin who personally maintains the annual contribution to our family church in Independence and donates every year to the Greater Providence Baptist Church in Algiers. It is Irvin who almost exclusively pays for the funerals in our family. It is Irvin who hosts our family during holidays, always with the gift of financial support for the family members who are in attendance. And it is uncle Irvin who all the nieces and nephews go to, because the answer is always "yes" -- the same "yes" that he gives to even our aunts and uncles.

While being one of the most generous people I know, Irvin is also one of the most disciplined. His ability to turn big dreams into a concrete reality was thanks to my uncle, Irvin's father, who was a drill sergeant. At the age of 9, Irvin began practicing trumpet 5 hours a day and never stopped. Even after earning every award and accolade a musician could want -- the Grammys, the Billboards, the Presidential nominations -- Irvin still practiced 5 hours a day, every day. But his passion for dreaming big and prioritizing education was thanks to his mother.

Although Irvin famously told his mother that his passion "doesn't require a degree," he has demonstrated one of the most impressive careers in education that a musician could muster. After leaving the University of New Orleans to pursue his dreams, Irvin returned to higher education at the age of 22 to begin teaching at UNO, and a decade later he received two honorary PhDs in Music.  Irvin donated his time as a performer to any and all schools that would call. Every year, he performed at my and my aunt's school, and in his early twenties, he even returned to his junior high school to teach one day per week for two years. He founded the Saturday School for Kids that serviced 100 kids every Saturday for 5 years for free, and he funded and performed the Project Prodigy Music Summer Camp for 7 years.

In 2014, Irvin broke the Guiness Book of World Records for the largest one-time reading of a book at the Main Branch Library in New Orleans, as part of his literacy campaign to make New Orleans the most literate city in America in 10 years. The tragic irony of my cousin's crisis is that the momentum he built to accomplish this dream came to a screeching halt when he became

painted as the Library and childhood education's enemy number 1. He had to step down from his participation in all those education programs, as well as his positions as Director of the Jazz Institute and Professor of Professional Practice in UNO's Music Department, and the city suffers for it. The students suffer for it.

It is my fear that keeping Irvin away from his instrument for a longer period than can physically be handled by a professional musician, and delaying his opportunity to start back and rebuild, is the same as a death sentence for the black, impoverished youth of our town. I tell my students every day that mistakes are going to happen, but the much more important message is that our young black men should be able to work together as a community to overcome our challenges, to make this a better place. But what chance do they have?

If a man like Irvin, with awards, credibility, renowned success, and a love and passion for children and their dreams, isn't given the opportunity for redemption, where does that leave the rest of them? And how much more must be endured than the loss of ability to help one's family? How much more than to have all of your accomplishments publicly eroded?

It is my hope that my cousin will be afforded the opportunity to redeem himself, to recover from the regret he feels of the trust he broke, and rebuild the work he began, built upon decades of discipline and dreams.

Thank you for your consideration of my perspective and insight.

Sincerely,
Tony Alsanders

Judge Jay Zainey
United States District Court

Dear Judge Zainey:

My name is Carol Ahn Markowitz and I am the Chief Operating Officer and Senior Vice President of Finance at Loyola University in New Orleans. I am a graduate of Stanford University and the Harvard School of Business. I submit this letter in my personal capacity in support of Irvin Mayfield.

I have known Irvin since approximately 2011, and know he is a loving father, brother and son. I also know his devotion to this city and his unique capacity to dream up big, ambitious ideas. I do not know the details of his offense, so I will not speak to that. However, I have spoken with him about it generally and I know that he is tremendously shamed, humbled, and sorry for what has happened. I also know that it is Irvin's worst nightmare to harm this city.

I know firsthand the incredible effort it took for Irvin to build NOJO from nothing the way he did. I myself co-founded the New Orleans Culinary & Hospitality Institute (NOCHI), which opened its doors in 2019. With NOCHI, the greatest obstacle was the funding necessary to launch. We were able to overcome the huge financial obstacles we faced by the strength of our vision, our supporters, and a whole lot of hutzpah (a key requirement for any entrepreneur). Irvin seemed to have all three with his vision for NOJO and the Jazz Market. Especially for someone with no background or training in business, non-profits, or fundraising, that was an astounding feat. That being said, Irvin clearly did not have, or heed, the right financial guidance and planning. I do not know if it was arrogance, or just sheer recklessness, but besides being apparently criminal, what happened is just plain sad. I wish I had been involved to prevent something like this from happening. While I support Irvin's mission, I do not support his mistakes, and I believe that this could have been prevented. It was totally unnecessary, especially since the vision behind the project was so outstanding and well-intentioned.

Between NOCHI and my work at Loyola, the common thread for me is how to make the most of limited resources for the greater good — of the culinary industry in the case of NOCHI and of the "Wolfpack" in the case of Loyola — and in both cases for the benefit of our city and for our community's future. I hope you will keep these values in mind as we all try to move forward from this deeply unfortunate and unnecessary episode. I am not familiar with the procedures of sentencing in federal court but I hope you can be creative in whatever punishment you give Irvin. He is such a talented man and a true teacher. I know his only goal now is to make up for whatever harm he has done. I hope you give him the opportunity to make it right.

Thank you for this opportunity to address Your Honor.

Carol Markowitz

Carol Ahn Markowitz

Your Honor:  I want to tell you about the two trains that are presented to my people in my city of New Orleans -- the one designed for failure, which was the one I was on before I met Irvin, and the one that Irvin worked hard to get a ticket on -- the success train.

I was on that other train where the societal systems feel like they're designed against your better wellbeing, and thankfully, Irvin pulled me onto the other track. I ask in Your Honor's sentencing, that you offer Irvin the same opportunity that he himself has offered so many -- a seat on the train of redemption and faith, not of punishment and jail time.

When I first met Irvin at NOCCA in 1997, he had just come back from summer studies with Wynton in New York and was visiting his alma mater. He and I were not very much alike, on the surface. During my time at NOCCA, let's just say I was not the model student in the public school system, but one day I took a chance and introduced myself to Irvin to ask him for a private lesson. Everyone was excited to do the same -- he was a star, charging $50 / hour for his lessons. I approached him and told him I couldn't afford his lessons, but I wanted a chance. He gave me my first lesson for free, and from that point on, our friendship grew and his mentorship began.

I was living in a very dysfunctional environment, with alcoholic parents and stepparents and traumas like being stabbed by my own mother. I was homeless most nights in the days that Irvin met me, and not only did he give me a home, but he gave me something more important -- an outlet. Whether it was my first invitation to a music gig, the first book I ever owned (A Movable Feast by Ernest Hemingway, his Christmas gift to me in 1999), my first suit, or first motorcycle ride in City Park, where Irvin patiently taught me how to ride a bike like a father would. What Irvin always provided for me was an alternative environment where I could be successful -- exposure to a different part of New Orleans to keep me off of the streets.

I grew up uptown right off Louisiana Avenue. I moved out at 16 years old and moved into the Calliope projects, staying with a girl I was dating who was 10 years my senior. Naturally, that fell through, and I had just met Irvin. The first thing he gave me was a home. The second thing was an English lesson. He grabbed a newspaper and started going through it with me, breaking down every noun, pronoun, conjunction, verb, adverb, and adjective. He taught me the importance of making my education relevant. From that point on, I followed him around like a little brother. And I remember carrying that newspaper with me the entire day.

Irvin comes from the highly disciplined world of jazz, where everyone is on the hunt with an insane amount of ambition. It's a world where self-worth is always at stake, and patience is demanded. But Irvin always extends beyond himself, and what he provided for me was a mirror, constantly reminding me of my own self worth, and extreme patience to nurture my growth. And not only for me, but for my son -- who I had during those rough teenage years in my life.

I remember bringing my son over to Irvin's famous Christmases where he would invite everyone over and offer gifts and donations to his friends and family. I'll never forget when he taught my son how to write an outline, but not just any outline -- an outline of his dreams and what he

wanted to do in his life. For someone like me who didn't grow up with the tools to survive, to now be able to turn around and now provide the wisdom of dreams for my son, who just graduated college...it's nothing short of life affirming.

To put my friend away for any amount of time, Your Honor, would be removing a dream-maker from our community, somebody who has created a formula to help instill hope and tools to work through the survival of life, in a culture that doesn't always provide that. Irvin could have taken his show on the road, he could have dipped out of New Orleans long ago, but he remained, like so few do, to help work through these cultural issues on the ground. And that's a fact.

I don't know where I would be in my life if Irvin hadn't interceded when he did. And I don't want to even think about where my son would be. I humbly ask Your Honor, on the behalf of myself, my son, and all young men who are like me without the tools and guidance -- please grant my friend the opportunity to remain in his community and serve his people through his gifts.

With hope,
Joshua Odum

To the Honorable Judge Zainey:

Art, culture, and philanthropy have always been my social bridges. I grew up in the Dominican Republic, sitting on my daddy's lap every Sunday listening to opera playing through the radio. And when I moved to New York City as a young woman, it was the opera, the ballet, the symphony, and the theatre that allowed me access to worlds I had only dreamed of. My beloved New Orleans offered me the same opportunity. As the favorite "token minority," I was invited to all the parties, and I've since dedicated my career of more than 30-years to cultural advocacy and philanthropy as a social editor and photojournalist. It has been a joy, and it is artists like Irvin Mayfield who make this city and its culture worth writing about.

Your Honor, I write to you without much knowledge of the case on which you are judging. I write to you to present a unique perspective on the value of Mr. Mayfield in our city's society through his cultural and philanthropic impact. Irvin is one of the few musicians I know willing to donate his support, not just with performances but also when he is needed in attendance at functions for our City's greatest causes. It has only been in recent years since his indictment that he has had to politely decline hosting or chairing fundraising events to avoid negative criticism for those organizations. We are all ready to get this behind us, and of course ready for Irvin to accept the growth and change he needs to get back to the great things he was doing before.

Looking back and looking ahead, I know that now is the time we need people to come together. Our town needs to rebuild, and our society is ready to have Irvin's face back in the community, as a person who has long been dedicated to rebuilding our beloved City in times of struggle. We are ready for Irvin Mayfield to return back to the world as a welcome advocate for these causes and events we pose for in the paper.

I thank Your Honor for your time and consideration of this great man and friend of mine.

Sincerely,
Margarita Bergen

Dear Judge Zainey --

Like a lot of us in this world, I was not born into a support system, nor a just one. I wasn't born into the beautiful family I've built, the homes I own, nor the businesses I've created. No, what happened for me was nothing short of a miracle in the form of a friend -- a man who became a pillar in my and my family's life, a man who had nothing to gain except for our appreciation. I write Your Honor to express the power of a friend like Irvin Mayfield, who is now the godfather of my children. I am humbled to share the story of our friendship with you, with the hopes of offering you a unique perspective on this man's incredible character.

I firmly believe that God does not give you more than you can handle. But like a lot of people in this town, the hand I was dealt has tried my faith and patience in humanity at many forks in the road.  Even before I was legally emancipated at 16-years old, I've always lived on my own. My mother was declared legally incompetent, my father's name was not even listed on my birth certificate, and I had trouble gaining access to any meaningful funds until I landed my first job at the Ritz Carlton at the age of 18. It was there at the Ritz in the early 2000's that my life made a dramatic shift, because it was there and then that I met Irvin.

After listening to my story, Irvin began taking time to teach me about what success really is, that it's something that begins inside of you. He began encouraging me to do more and want more for myself. It was through Irvin's guidance and friendship that I came to believe that I could own a home, grow my role in the hospitality industry, and afford the finer things in life. He made me feel that I was worthy of a different story, and challenging me to take responsibility in writing it. Although he couldn't prevent the hardships in my life that were still to come, Irvin became the shoulder I looked to for emotional support, and the big brother who continued to teach me how acclimate myself in all environments and allowing me to participate in bills he was working on.

When I was pregnant with my first daughter, I encountered the injustice of the prison system for the first time. My sister was wrongfully put in jail, and we didn't have the resources to fight appropriately. I was pregnant with my first daughter and was now the guardian of my sister's children. Irvin stepped in to facilitate, knowing he could help bring my sister to justice. Whether it was finding us the proper attorney when we had no one, or walking us through the process of gathering character witness letters from all of my sister's professors and colleagues -- Irvin quarterbacked and expedited my sister's release back to her life.

When my sister picked back up her schooling, she ended up in Irvin's class at UNO. And thus began *their* friendship and her growth into the woman she is today.  He helped her to believe that she could survive even after the injustice she faced. He encouraged her to follow her dreams, regardless of the embarrassment and hardship. The perseverance that he instilled in here led her down a beautiful path -- she followed her dream to study abroad in Paris, she worked hard on her way to the top where she is now the Chair of the local Real Estate Broker Association, and the niece who I raised is now 21, in her junior year at college, in the process of buying herself a condo in Atlanta with A1 credit.

While he did take on the role to help me like a father and a brother would do, Irvin always reminded me that if I wanted things to be different in my life, I had to make them different. From the moment I first became pregnant with my first child to today, I knew he needed to be the godfather of my children. Irvin has provided the same love and support to my girls as he did for me, and while I take full responsibility for the place I am today -- I am the founder of a successful share economy business in the technology sector, my sister and I both own property here in town and in Zachary, TX, and I run a long-standing mentoring non-profit NOLA Cupcakes Girls Club where I coach young girls through the struggles they face in life, much like the ones I faced. It was Irvin, as my mentor of almost 20-years, who inspired me to pay it forward to young women, and since I founded the organization over 15 years ago throughout the COVID lockdown, Irvin always said "yes" to every opportunity to coach the girls through these challenging times).

There is no doubt that it is in large thanks to Irvin's care as a friend and a teacher that none of my children or my sister's children will ever know what it's like to grow up as we did.  For that, I am eternally grateful to him. I ask for Your Honor's leniency in granting Irvin the ability to remain a powerful teacher and support system for his family, my family, and the countless others who I know come to him regularly seeking guidance.


Sincerely,
Tancherelle Washington

To the Honorable Judge --

It's rare that you find a person whose words of wisdom can actually change your life. But that's the kind of person Irvin Mayfield is -- rare.

For someone like me, whose freedom from wrongful imprisonment is largely thanks to him, and whose life was changed in his classroom at UNO, I can't help but ask Your Honor for the most leniency for Irvin. I write to you to consider the impact this man has when he is in the community supporting other people's success. His influence and inspiration are far too great to have him anywhere else except in the world, certainly not behind bars.

I first knew Irvin through his friendship with my sister and his support during our darkest hours; but it was really through Irvin's class that I had the opportunity to change my life by expanding my thinking. I know I'm not alone when I say that I never had a class at college like his. His teaching style was so unique. He flooded the class with opportunities -- to dream, develop, and grow new ideas. But the sad irony is that this isn't the norm. The "usual" is black people being put in prison, unjustly, like I was, and otherwise. The very "unusual" is black people going to a powerful lecture with a speaker series, led by a black man, that changes lives in every class. A person like me doesn't usually get the chance to sit at those tables.

Growing up in the hood, unfortunately not privileged to be born to supportive parents, my mom sick from the day I was born -- I really should be some strung out drug addict. But that hope and access that Irvin offered me actually changed the whole course of my life. For the average person like me to have access to someone like Irvin is rare, but to actually have him lead and guide and pour into me the knowledge that I can overcome any obstacle? It was so powerful that I am now living a life opening doors of opportunity to people in need, like Irvin did for me.

As Chair of the New Orleans Real Estate Broker Association, I can offer people the opportunity to build generational wealth, to be successful, and to have a better quality of life. I understand that home ownership is one of those keys to success, as it pertains to building wealth, or even just having a good quality of life. I am doing what I love. But even now, in this successful time in my life, I *still* look to Irvin. When I received the Chair position, I encountered all the hidden politics lurking beneath the surface -- the internal barriers in the system that prevent us from doing our jobs, from actually helping people. Irvin coached me through my induction with insight and courage to face the system, despite the red tape and prejudice and rules that hinder success for average people. And I know I can call him for whatever arises on my path.

I do believe that God judges the hearts of men, and at the end of the day, Irvin's heart supercedes any ego, any type of perceived arrogance. His heart above all else is pure. His heart is solid. He cares about people and their upward mobility. When it comes down to people's lives, he's our champion.

Sincerely, T.Denise Washington



**CHAUVIN ARKHITEKTON, APC**

November, 1, 2021

Judge Jay Zainey

United States District Court

Judge Zainey,

I am writing this letter in support of Irvin Mayfield. Perhaps you already know, as I do, that Irvin is a good man, beloved by his family and a gifted musician beloved by our community. I have come to know Irvin as a friend, for he is married to the daughter of my very good friend, Dr. Madeline Feldman. In the years I have known Irvin, I have not only seen his music inspire unity and love within our City, but I have also seen how his love and marriage to his wife, Sydney, has had the most marvelous and positive effect upon her. Music and love have the power to sometimes perform miracles. Both Irvin and Sydney are such talented musicians. Their music is an expression of love for each other and for New Orleans. As you know, Irvin provides and cares for his mother and brother. His time spent with his beautiful daughter is equally precious and valuable to her nurturing. I do not know the specifics of the case before you, but I write in hope you can find a positive alternative sentencing for Irvin, rather than the detriment that prison may incur.

Respectfully,

Stephen Chauvin

Your Honor:

I was compelled to write this because there has to be a mistake. There's no way that what the press portrays and what I personally know to be true of Irvin Mayfield could exist in the same universe. Of course, I don't know if writing this letter makes any difference. Maybe Your Honor has not personally experienced what kind of positive force Irvin is, as I have. Or perhaps Your Honor believes the details of this case more than you could possibly believe the words I write. Regardless, I have to take the opportunity to sing his praises where praise is due, because the sad truth is that Irvin Mayfield will never get credit for even a fraction of the work he's done in this world.

I am a young developing artist in New Orleans, and no matter how many tours I've been on, supporting other bands as their singer in stadiums and festivals around the world, I always come back home to sing at my church Ebenezar Baptist Church. As Praise and Worship leader of New Philippians, I have an incredible amount of respect for well known musicians like Irvin and Ron Markham. In the church, Ron was celebrated as a long-standing musical director for the largest Baptist church in New Orleans — Greater Saint Stephen. And Irvin is known to most black residents as the one musician who will go visit and perform at churches as part of the service. Of course, he's always been somewhat of a celebrity upon arrival, but in his work, he carries with him the richness of his spirituality.

I met Irvin and Ron personally in their music studio they opened in the Treme, called the BlackHouse. The BlackHouse became this sacred space, a Church of sorts, for artists like myself -- a lot of musicians and singers who already knew each other from growing up, but never got to engage with one another in a creative space. Irvin and Ron opened up this space in a converted grocery store and gave so much freedom to all of us young artists to make it what we needed it to be. It was a recording studio, a practice space, a meeting place, a performance venue to play without any agenda or audience.

Every week on Mondays, we would gather to sing, play, and enjoy each other's company in an artistic environment -- something that is not only rare in our town, but almost unheard of anywhere I've toured. We truly had a place of our own in town that was unmatched by any other, and Irvin and Ron provided that. And during the pandemic, when all other spaces closed down to us, Irvin and Ron turned the BlackHouse into a live recording studio, and offered me the opportunity to record and share music online with a global audience, using his clout and connections in the industry.

What I can see is that being Irvin Mayfield right now, and doing what he's done for the musicians and artists here for the past 2 years while being publicly assassinated with nothing but negative press...it's not easy. And even within our own community of artists, when a news story will run, a musician will snicker and gossip, and then turn around a week later and ask him for a gig or $200.

When he's performing, Irvin literally changes lives. From what I'm reading, this can't be something that Your Honor or anyone else in this case knows because I would imagine what I'd be hearing and reading would be different. Irvin has had too many opportunities to let me down, and let others down, and not once has he done that. While being publicly shamed, with other people taking advantage of his situation for their own interest, he still offers opportunities to all of them. Throwing stones isn't in my belief system, and I wonder why aren't we working together to do something great for our kids and developing creatives in town, especially when the sinner is willing, able, and ready?

I hope these words have impact for Your Honor. Thank you for your time.


Humbly,
Chrishira Perrier

To the Honorable Judge Zainey:

Bob Dylan and I collaborated for the first time many years ago, and as I write this letter, many of the conversations that he and I shared are coming to mind. This is most likely because many of the issues that I've read regarding this case at hand speak to the core of a person born out of our time (from the research I've done, I estimate that Your Honor and I are roughly in the same generation). Dylan and I spoke often about the importance of revolution, the power of a great soundtrack, the dire need for an appropriate conductor to lead the orchestra. Because like every orchestra, every revolution needs the best leader.

Judge, my friend, colleague, fellow-artist and confidant, Irvin Mayfield, is the last remaining leader I trust to write the soundtrack of our City's story, and conduct the orchestra who plays it. I am the last of the Neville Brothers to remain in town, and like you I have quite a bit of perspective looking back across history. It is a high honor and tremendous opportunity that Your Honor has as a Federal Judge to be part of this young man and our city's new journey forward.

As a man in his seventies, becoming more and more aware of his mortality with every award and recognition, I feel a sense of urgency to protect those who carry the tradition and legacy forward. There is no one else in this day and age who can do the work that Irvin can and does do for the city. Even if there were a baton to pass, there is no one trustworthy enough to pass it to.  There really is no other Irvin Mayfield, and it would take much more than 30 years, reared in the now-dying New Orleans traditions, practicing, playing, touring, building organizations and facilities in the heart of our culture's black neighborhoods, and offering free services to our most in-need communities to build another musician like him.

And our town doesn't have that kind of time.

Your Honor, you and I were born in a time where communities of people bonded together demanding justice, equality, fairness.  I don't know a lot of the details, but my understanding of the case is that it primarily concerns an inappropriate use of funds, so I am highly sensitive to the matter, and do not condone unjust behavior. But having known Irvin since he was a child, I have witnessed this young man to be one of the most unconditionally generous people I know. So, I feel compelled to provide an alternative narrative to the picture that has been painted of him, as a greedy, arrogant man with bad intent. Since no accolades or news stories were written to showcase the following acts of service that Irvin provided for our music community, I will outline them here:

1) Built the first space for Jazz in the city that created Jazz, and the third space in America to do it -- Wynton Marsalis in New York; SFJazz in San Francisco; and Irvin and Ronald with the Jazz Market. It is the only performing arts institution in town that has its own building. This is something that neither the New Orleans Opera, Symphony, nor the Ballet have. Even more powerful, it stands on the corner of Martin Luther King Blvd. and Oretha Castle Haley Blvd. -- two of my personal heroes;

2) Created a partnership between the Library and Jazz. Regardless of the intention or spirit in which it was forged, it was a tremendous and unprecedented opportunity for our town and our people;

3) Provided more jobs for musicians than any other musician in the history of New Orleans -- including the Neville Brothers, Louis Armstrong, Dr. John.  As a proprietor of his own private businesses, Irvin created well paying, honest jobs for musicians that, quite honestly, mostly dried up since Irvin has been sidelined;

4) Developed and maintained a Saturday music school and summer camp for kids, which a few of my own grandchildren attended. This was a free service he provided, and for many kids this was the first time they entered a college campus. I also know personally that a lot of the faculty at the university were against this type of non-university program; Irvin advocated annually to keep it in the budget;

5) Taught at the university level from the age of 22 for 17 years (until the negative new stories started running), all while keeping an intense global touring schedule that even the most seasoned of us admire. He is the only musician I know without a college degree to accomplish these feats in academia;

6) Performed at various nursing homes, Children's Hospital's ward for terminally-ill children, and innumerable school programs. I know this personally because I collaborated with Irvin on these efforts, and when I was out of town, unavailable on tour, Irvin would still go in my place and service the programs alone;

7) Gave free trumpet lessons to anyone who asked. I know this as a fact from individuals who I personally recommended for lessons, for which he donated his services as a teacher;

8) Contributed (mostly by himself) financial resources for musicians who fell on hard times, and for the big Jazz Funeral burials that New Orleans touts. He was always the number 1 contributor for these events, as well as providing the space at his music clubs or his personal home for political award ceremonies — from Mayoral election parties to Social Aid and Pleasure Club Memorial Services;

These are a lot of accolades for a person who never tried to run for public office, and has had no public office interest, and has behaved in accordance with who and what he is — a creative professional, a musician, a star of our town. No musician from my knowledge in 74 years has contributed more to the concrete, tangible framework in job creation and mentorship and performances for people who live in New Orleans, and for the musicians of the town. In this way, Irvin has made just as much of an impact on our town's people as Louis Armstrong, Jelly Roll Morton, and certainly more than any musician today.

I admit I know very little about the mechanics of the criminal justice system, other than having watched fellow musicians and family members go through it: James Booker, Dr. John, Willie

Nelson, and even my two brothers, Aaron and Charles. With so many close friends of mine having now passed away, I think about the times they spent behind bars, how their time could have been spent better doing their work -- my brother, Charles, for instance, shared an Angola jail cell with a murderer for 5 years for having a joint. And then there are those I know who were granted a second chance -- my big brother, Aaron, was blessed when on trial for more serious offenses, his judge took a last minute opportunity to grant him his freedom; or my friend Willie Nelson who was able to make a deal in which he could tour and use his artform to pay off his taxes. This being all I know, I do strongly believe and hope Your Honor also believes that this matter can be solved with a civil approach outside of a jail sentence for someone who is obviously very coachable, very dedicated, and very humbled by the situation.

Finally, it must be mentioned that even throughout these times -- one could argue the hardest in history for performance artists, with a global lockdown on all performance spaces -- Irvin opened up his studio in the Treme, the BlackHouse.  I ask that you take a few minutes to watch this powerful visual illustration of the studio space that he and Ronald Markham built in the months leading up to the pandemic and safely continued on during lockdown.

For artists, both developing and seasoned alike, the BlackHouse provided ways for musicians to learn and work and play, providing full-service production studio at no cost to the musicians. In my case, I was able to re-start my career, retire from the old and re-imagine my future as a musician in these latter years of my life. During the pandemic, Irvin brought together an incredible team of musicians to create a live recording of work that he and I wrote together. In a time when almost no opportunities existed, Irvin offered us a lifeline.

Irvin is aware that all of these accomplishments could never have seen the light without supporters like his best friend and fellow musician, Ronald Markham, his teachers and mentors, and even the Catholic Church that he and I grew up in at St. Francis Assisi and Holy Ghost Catholic Church, where today the nuns pray for him and his redemption. And as children of God, we know that everybody's journey is different. I got through my own journey, like my brother Aaron, and one thing is for certain — I stand shoulder to shoulder with my brother Aaron, Kermit Ruffins, and my friends, like Dr. John who I spoke with before he passed, who all believe there is a better path for Irvin Mayfield.

Your Honor has the blessed opportunity to do something about it and participate in this new path, to restore public trust, and allow him to create more amazing things. I know there's more inside of Irvin Mayfield, and I am willing to work with Your Honor in partnership to ensure this story is told the right way and make your plan come to life.

My deepest appreciation for your time, work, and consideration.

Sincerely,
Cyril Neville



LEGIER
& COMPANY apac

July 26, 2021

The Honorable Jay C. Zainey
United States District Judge for the
Eastern District of Louisiana
500 Poydras Street
New Orleans, LA 70130

Dear Judge Zainey:

I have been asked to share my insights, opinions and observations regarding the involvement of
Irvin Mayfield and Ronald Markham in the New Orleans Public Library Foundation ("NOPLF")
and New Orleans Jazz Orchestra ("NOJO"), as well as the circumstances surrounding the
indictment against them in connection therewith ("the Indictment"), on a high-level basis, in lieu
of a traditional expert report.

To be clear from the onset, I understand that Mr. Mayfield and Mr. Markham have pleaded guilty
to transferring funds from NOPLF to NOJO without authorization, to be used for purposes not
approved by the board of that organization. I do not write to explain or excuse that conduct, nor
suggest that Mr. Mayfield and Mr. Markham are innocent of that crime. Moreover, I recognize
that you, Your Honor, are the ultimate decider of fact in this matter. I only write to provide my
observations about the circumstances of that crime, based on my review of the extensive financial
documents in this case and my 50 years of accounting experience, including many fraud cases like
this one.

As I hope will be clear from my discussion below, this case is an outlier among the fraud cases I
have examined. Thus, I attempted to focus my efforts on highlighting for Your Honor the aspects
of this case that make it unique.

### My Involvement

I have been engaged by Claude Kelly, Chief Federal Defender for the Eastern District of Louisiana,
to study and analyze documents and information regarding the involvement of Irvin Mayfield and
Ronald Markham in NOPLF and NOJO and the Indictment. In this letter, I have been asked to
summarize the specific findings that I believe would be most useful to better understand the
circumstances of this case. The vast majority of this information came from the large production
of documents provided by the prosecution in discovery. I also reviewed the Indictment and Factual
Basis in this case to aid in my analysis.

## My Background

I have practiced in the field of accountancy for over 50 years. I am a Certified Public Accountant, Certified Fraud Examiner and Certified in Financial Forensics. I began my accounting career with Arthur Andersen and Co., Certified Public Accountants, in 1970 after graduating from Louisiana State University. I then became employed as Vice President of Finance and Operations of two large multimillion dollar wholesale distribution companies before founding the firm of Legier & Co., *apac*, Forensic CPAs and Business Consultants in 1984 where I have served as its President and CEO until this day. In this role, I have frequently testified in U.S. Federal District Courts and Civil District Courts throughout the country with expertise as a Certified Public Accountant, Certified in Financial Forensics and a Certified Fraud Examiner.

I have also served on numerous not for profit boards throughout the New Orleans area, including the Friends of NOCCA ("NOCCA"), where I served as President during the time that this entity acquired historic cotton press warehouses on the Mississippi River in the Bywater area of New Orleans and completed an extensive historic restoration of this property into what is now known as the New Orleans Center For the Creative Arts, a twenty million dollar conservatory for the arts which continues its successful growth until this day.

Additionally, I am the owner and Managing Member of de la Tour Holdings, LLC, a real estate development and investment company that owns and operates a multimillion dollar portfolio of numerous commercial and residential mixed use real estate properties throughout the Gulf Coast region. Several of these properties are noted historic buildings that have undergone or are currently undergoing historic restoration in accordance with the Historic Preservation Standards of the U. S. Park Service and State Historic Preservation Offices in Louisiana and Mississippi.

## Summary of Insights, Opinions, and Observations

<u>NOJO's Financial Health</u>

First, I want to discuss the organization that benefited from the misappropriated funds in this case, NOJO, because that is a unique element of this case, in my view. Below is a description of the revenues earned and expenses incurred by NOJO from the fiscal year that ended on 6/30/2008 (the year NOJO was founded by Mr. Mayfield) until the fiscal year that ended on 6/30/2016 (the year Mr. Markham departed NOJO):

- Operating Revenues -- $5,529,000[1]
- Investment Revenues - $3,691,000[2]
- Contributions and Grants Revenues - $7,353,000 (including the $1,316,000 of NOPLF Funds relevant to this case)
- Total of all Revenues - $16,573,000
- Total Profit (Change in Net Assets) - $1,539,000

---

[1] Including performance fees earned from special events such as the Carnegie Hall Gala, the Big Beat Gala, Love Sessions, Local Concert Series, Other Performances Events and Merchandise Sales.

[2] Including Tax Credit Income of $3,472,000.

2

There are a few key observations to be taken from this snapshot. First, NOJO generated a substantial amount of operating revenue ($5,529,000) and total revenue ($16,573,000) for a relatively small non-profit organization. In order to generate these levels of revenue and related profits, significant operational and production efforts and talents were required. In studying NOJO's financial records, I observed that the benefits of events like those put on by NOJO under the leadership of Mr. Mayfield and Mr. Markham are notable, and the non-profit created substantial output in terms of musical recordings and productions which were intended to be available to the public at the New Orleans Jazz Market Library at no charge. I also note that NOJO operated at a total net profit, uncommon for many small non-profits.

Of course, it is important to note that NOJO's total Revenue of $16,573,000 (and Profit/Change in Net Assets of $1,539,000) includes the misappropriated $1,316,000 from NOPLF described in the Indictment. However, I found it notable that, if that amount were subtracted from the above referenced profits, then there were still profits remaining, even after the payment of all expenses, including the salaries of Mr. Mayfield and Mr. Markham. Indeed, there may not have been sufficient funds available at all times to pay the salaries of Mr. Mayfield or Mr. Markham (or various other NOJO expenses) without the temporary use of NOPLF funds or other income streams, but that is not always an appropriate way to look at organizational profits and operational health from a financial accounting perspective, including non-profits. Like many non-profits, NOJO always operated close to its margins, but, from my perspective, it is notable that, over time, it was a profitable and generally healthy organization. That is why, in my view, it is significant that there were ultimately enough profits from NOJO's other operations to cover NOJO expenses, even without the NOPLF Funds of $1,316,000, leaving surplus profits after NOJO's payments of all of its expenses. That is noteworthy for a small non-profit.

One other important note about non-profits is that it is not uncommon for non-profits, at any given time, to lack necessary funds to pay all current expenses, including salaries, without borrowing money. Because non-profits often operate on tight margins (as they must), funds will ebb and flow. That is why some heads of non-profits may forgo their own salaries for periods to keep the organization running. Indeed, in this case, Mr. Markham and Mr. Mayfield often forwent salaries themselves. Moreover, their salaries remained the same throughout this time period, and they also provided substantial personal loans to NOJO, which sometimes were paid back and sometimes were simply forgiven. For example, documents I examined indicated that Mr. Mayfield loaned at least $45,000 and Mr. Markham loaned at least $8,000 to the organization, in addition to forgoing/deferring their salaries at times.

I highlight these observations because my study of NOJO's financial documents did not clearly indicate two individuals raiding a non-profit organization for personal profit, which is a unique element of this case and makes it an outlier among fraud cases I have examined. Moreover, NOJO was by no means a shell or pass-through operation to cover a fraud, as I often see in fraud cases. Instead, NOJO was a functioning non-profit with impressive revenue, run by two individuals who were both benefiting from it (as any employee does), while also loaning to it their personal funds at times.

NOJO's Growth and Development of the Jazz Market

It is also noteworthy to highlight another point that led me to the conclusion that I have reached herein, namely, the significant growth of NOJO's assets over the relevant period, wherein NOJO's total assets increased from $140,000 to $15,628,000. A significant component of this growth was NOJO's acquisition and rehabilitation of its New Orleans Jazz Market property located at 1436 Oretha Castle Haley Blvd. This $7,700,000 property acquisition and restoration, along with other property restorations on Oretha Castle Haley Blvd., contributed significantly to the revitalization of this previously rundown historic district of New Orleans.

Based upon my experience in restoring historic buildings and my study of the records in this case, this building restoration project required very significant efforts beginning years before the start of construction. Those pre-construction efforts included property identification, inspection, and consideration of multiple sites, as well as preparation of financial projections and determinations of feasibility, negotiations with sellers, arrangement and negotiating of finances to acquire and restore the property, engagement of key players (such as attorneys, contractors and architects), obtaining architectural drawings and renderings and securing investors. The project in this case also included navigation of complex tax issues, such as the critical historical tax credit process. That process entailed requesting approval that the proposed property be qualified as a historic property for Federal and State Tax purposes, that its architectural plans and specifications are in keeping with requirements and regulations of the State and Federal Government and final approval that the project was completed as proposed, as well as identifying a suitable financial entity to purchase the tax credits earned on the project and completion of legal documents and negotiations associated therewith. This list of required work does not consider that NOJO, the organization spearheading this project, had to be run and financed while pre-construction preparations for the project were occurring, as well as during its construction of this project, including staff salaries, office space, ongoing fund-raising efforts, and other expenses.

I highlight these issues because they stood out to me when studying this case. The scope of the work described above is substantial and far outside the normal realm of what small non-profit organizations are typically able to accomplish, in my experience.. These are complex, time-intensive tasks that require a high level of skill, foresight, and expertise. It is my belief that the salaries drawn by Mr. Markham and Mr. Mayfield during Jazz Market development, fundraising and construction were by no means unreasonable. Certainly, those salaries were not unearned benefits as I often see in fraud cases and thus, did not clearly indicate that NOJO was simply being used as a conduit to channel funds to them, again, a common hallmark of typical fraud that is not present in this case. In my opinion, those salaries were reasonably earned compensation for their significant services provided to NOJO, rather than theft or fraudulent spending. This is another aspect of this fraud case that makes it an outlier, in my view.

Use of NOPLF Funds

Finally, I want to discuss the specific NOPLF funds at issue in this case, which, again, Mr. Markham and Mr. Mayfield have admitted were taken improperly and transferred to NOJO accounts. According to the Indictment, the total amount of these transferred funds was $1,316,000 over time. The Factual Basis describes the total amount of each of these various transfers from

4

NOPLF and then details certain NOJO expenses, but not all, that were paid in time periods after the transfers.

I found that list of NOJO expenditures to be incomplete and not particularly helpful, so I instead looked at these numbers in more detail and in a more easy to understand summary for Your Honor. Thus, I have provided more detail in addition to broad categories of expenditures listed in the Factual Basis, along with an associated percentage of the $1,316,000 for each category:

      a.  61% ($805,000) – General NOJO operating expenses
      b.  12% ($157,000) – Costs associated with NOJO performances, events and fundraising, including associated travel costs and venue fees
      c.  1.9% ($25,000) – Repayments of prior loans made to NOJO by Mr. Mayfield
      d.  1.75% ($23,000) – Payments for a sculptor
      e.  13.54% ($178,000) – Payment of Mr. Mayfield and Mr. Markham's salaries
      f.  1.7% ($23,000) – Saks Fifth Avenue and Harrah's
      g.  1.14% ($15,000) – Payment for a gold Trumpet
      h.  2% ($27,000) – Payments to Mayfield Productions
      i.  4.8% ($63,000) – Non-salary payments to Irvin Mayfield

First, to clarify what the above amounts mean, my study of NOJO finances over the relevant period indicates that the Factual Basis does not describe all of NOJO's expenditures that were made from the NOPLF funds cited in the Factual Basis as I have shown above, nor does it describe all of NOJO's other operating expenditures over that period, but lists a selected subset of NOJO expenditures instead. Therefore, it was my conclusion that this list should not be interpreted as a representation of how NOJO funds were spent generally, but should be treated as a selected subset of all of NOJO's expenditures. I also note at the onset that the purpose of my correspondence here is not to pass judgment on the wisdom or ethics of any given aspect of NOJO spending or to excuse specific expenditures that may be troubling, such as expensive travel, for example. I understand why some of the expenditures might seem more troubling than others, and my analysis is not intended to reduce that concern but rather to put them in prospective.

However, these numbers do tell me something as a fraud examiner that I wanted to summarize for Your Honor. First and foremost, they are not typical of the usual fraud case that I see, as they do not generally reflect the type of fraudulent plundering of an organization that I see in those cases. In other words, the numbers here do not appear to be typical indicia of fraud to the same degree as these other fraud cases where money is unlawfully stolen in a surreptitious manner solely for a defendant's own personal use. In these previous cases, I typically identify indicators of fraud, including self-dealing in construction projects, secretly inflated invoices and stolen money. Moreover, in the typical fraud case, a defendant is not typically loaning money to and deferring their salaries from the entity that they are stealing. In fact, I have never seen that in any fraud case I have examined.

Additionally, typical fraud cases do not involve situations where the clear majority of funds misappropriated were for the benefit of a non-profit organization, rather than the defendant directly. In this case, most of the misappropriated monies were used for the benefit of NOJO's operations, including its fundraising events and other projects that created revenues and profits

5

that benefited NOJO and other non-profits. Moreover, the remainder may be categorized as unwise and reckless spending but is not what I would categorize as theft or fraudulent spending once funds were in NOJO accounts. Again, that is not to say this was legally permissible: the funds were transferred and used without authorization.

Of course, I appreciate that Mr. Markham and Mr. Mayfield drew salaries from NOJO and benefited in other ways from it and, by extension, any funds that flowed into NOJO, including those from NOPLF. However, my study of the records and court documents in this case indicates that those direct personal benefits did not represent a substantial portion of the $1.3 million transferred from NOPLF to NOJO. Moreover, there can be no doubt that NOJO was a functioning and profitable organization producing tangible benefits in accordance with its mission and goals. It was not a shell company designed to simply channel funds to Mr. Markham and Mr. Mayfield. That is an unusual feature of this case.

### Conclusion

Finally, in closing, let me offer some broad insights based on my experience and study of this case, which may be lost in my discussion of specific numbers. This is a fraud case unlike any I have seen. I also view it to be tragic and unnecessary for all involved. My study revealed two talented, conscientious individuals with immense potential and tremendous value to give. I do not believe this needed to end the way it did, had all been done according to applicable laws, proper business procedures and ethics, particularly since there is no indication in the records that I studied that these two people set out to steal money in a surreptitious manner, solely to enrich themselves. There appears to have been a worthy vision in the works here, one that was executed both spectacularly well and spectacularly poorly.

During my involvement as president of the Board of NOCCA, one of my recommendations was that NOCCA students be required to be trained in the basic aspects of business and finance to enable them to be better equipped for the business aspects of their careers and avoid the types of carelessness and sloppiness than can lead to serious trouble as in this case. In my experience, most artists do not possess a natural business acumen, especially where the environment that they grew up in did not expose them to proper business practices. Mr. Markham and Mr. Mayfield are prime examples of this, in my view. I am left to wonder if this could have been avoided.

Thank you for the opportunity to provide these insights, opinions and observations to you. Please do not hesitate to contact me for any questions or requests for clarification.

Sincerely,

William R. Legier, CPA, CFE, CFF

6

October 11, 2021

The Honorable Jay C. Zainey
United States District Court
500 Poydras Street
Room C455
New Orleans, LA  70130

Hello Judge Zainey,

   My name is Karen England. I am a CPA licensed in Louisiana but I have chosen to not renew my
license for several years as I do not practice, any longer. I  now own and operate a small hotel in Grand
Isle, Louisiana, The Blue Dolphin Inn and Cottages.

   I met Ronald Markham when I chose to help the New Orleans Jazz Orchestra and the Jazz Market
(pro bono) in the beginning of 2016. This was after some questions from the Louisiana Legislative
Auditors Office. Our goal was to organize the bookkeeping and provide any clarification needed to resolve
questions. I thought (and still do believe) the intention and the great work of NOJO is truly amazing. My
desire to help the organization was in helping them to get their bookkeeping straight. While Mr. Markham
was an excellent manager and promoter, he had little history in the correct way to manage the
bookkeeping.

   When I first started to "dig in" to the books, I found that the system wasn't well designed to account for
the various concerts properly and, quite honestly, very difficult for Mr. Markham to manage. I found him "a
bit over his head". His excellent attitude and willingness to learn and "get it right" were exceptional.  He
worked tirelessly with me to get the accounting system corrected and understand how the improprieties
had occurred.

   My impression of this young man is this: He is an honest, hard working, likeable and very caring man.
He adores his family (very sweet wife and two young boys) and spends pretty much all of his time when
he is not working, with them.  He is polite, respectful and kind. I do not believe he understood basic
accounting principles and the need to segregate funds in separate accounts.  In my review, I did not find
that any money was missing.  Rather, any errors were issues related to incorrect classification of funds.

   I truly believe it would be devastating to his sweet family including his two young boys for him to be
incarcerated.  I certainly hope that his excellent character and way of being will shine through during this
awful time and his family does not have to go through any more pain due to the circumstances.

   I can be reached at                     if you, or anyone, would like any clarification or have further
questions. Please feel free to call or email me.

With kindest regards,
Karen England

October 6, 2021

The Honorable Jay C. Zainey
United States District Court
500 Poydras Street
Room C455
New Orleans, LA  70130

Dear Judge Zainey,

I pray all is well. My name is Ronald S. Markham, Sr. and I am Ronald Markham's father. Ronald's mother and I have been married for 47 years. Ronald is our oldest son and the middle child of our three children. At an early age we taught our children the act of giving and the joy resulting from doing so. Ronald made giving to others his way of life. As a grade school student and as a performing artist, Ronald has created and continues to create opportunities to give and serve others.

As a youngster Ronald gave Christmas gifts to needy children every year. Our children had to use their own Christmas money to buy the gifts. Then we brought them to local charities so they could experience the joy of selfless giving. This was a family tradition which impacted Ronald permanently.

As a leader of People's Health Jazz Market he organized a summer reading program for area youth. This was a solo Market initiative planned from the inception of the Market. Ronald made it clear to area residents the Jazz Market belonged to the community. Teachers were hired to work with the students because Ronald believed the children deserved professional level help. There were also youth music programs operating at the Market that were open to all who came. At least 300 young people and their family members participated and were helped by these programs.

He organized an effort to bring New Orleans' musicians back to N.O. after Katrina devastated the city displaced them. Ronald was a guest on the Larry King Show shortly after Katrina. He explained on national television his call to displaced New Orleans' musicians to return home to resume their careers. The message was instrumental in the return of at least 20 local musicians.

1

Over the years Ronald has supported countless N.O. musicians. Primarily, the support was regular work and regular paychecks. The struggle for musicians has always been securing regular work and regular pay. Understanding this, Ronald arranged for local musicians to perform with him. Ultimately, through the New Orleans Jazz Orchestra 25 musicians and staff members were hired for regular performances and traveled across the United States.

Over the last 20 years Ronald has donated his time to visit and inspire young students in the classroom and in audiences. He served as a volunteer recruiter of talented young musicians for placement at New Orleans Center for the Creative Arts (NOCCA). Performances and presentations in over 50 U.S. cities, Ronald has inspired young people with his musical talent and has taught them the basics of music and performing. He has enriched the lives of countless young people, including college students.

Ronald is a loving husband and an exceptional father of two bright sons. His boys are outstanding students, products of loving parents and Ronald's intensive efforts to equip them for academic excellence.  Though he maintains a remarkably busy schedule, he's always home when not practicing, performing, or serving his business clients. His sons adore him. He and his wife are best friends. Miranda and Ronald met 20 years ago, as it's as if they are still dating.  This is a perfect union because Miranda extensively travels in her leadership position. Ronald wakes the boys for school, preps breakfast and lunches, drops them off at school, picks them up after school, helps with homework and prepares dinner. Ronald's absence would be devastating to his family. There is no substitute for his daily love, guidance, and care.

It was evident early in Ronald's life he would make a difference in whatever endeavors he set his mind to. His God-given giftedness in music, math and science made him a standout student all through school. However, it was his character and how he utilized his gifts to serve others that define who he is.

Ronald has been serving the New Orleans community his entire life. He has refused numerous attractive offers to move to other cities. He cares about New Orleans and the music community cares about him. His deposits in the city have ignited a new interest in Jazz music.

To remove Ronald from the New Orleans scene would be disastrous for him and his family. It would be a destructive impact on his two sons who need him present and operating in their daily lives. It would be an unrecoverable loss to the New Orleans music and business communities. It would be the loss of an advocate the youth of the city desperately need. It would be the loss of a creative force for the business clients that depend on him to help them promote their local businesses. There are friends and acquaintances that will lose their go-to guy for support and wise counsel. There are people who cannot be numbered who are inspired and motivated every time Ronald performs or works behind the scenes of an event.

As strong as Ronald is, it is impossible to determine the impact incarceration will have on this young man who means so much to so many. Who has given so much of himself to the New Orleans community. Who has chosen New Orleans over all other cities to permanently plant his roots. Who is a positive force within the New Orleans business community. To remove Ronald from the New Orleans scene would be the same as removing him from his food, water, and oxygen. Removing him would create a great void in the New Orleans community – a void no one else can fill. Ronald and New Orleans need each other. They need to be together.

I am joined by my entire family and many others across the city in a request that Ronald be spared incarceration. He has led a life that is all but ordinary. He has always taken a stand for right and has always actively sought out opportunities to do good and help others. He has never been carried away by his popularity or his accomplishments. He has always been grounded by the Christian principles he learned growing up in Bibleway Missionary Baptist Church, where he learned how to play the piano. So he realized his talent was a gift. And what he did with that gift had to be done for the greater good. He played for the church, then for the general public. He has been doing this since his early teens. He has never stopped regardless of life's twists and turns. Please allow him to continue sharing his gift and his love for the New Orleans community. Please do not interrupt the good work he has committed himself to accomplish. Your thoughtful consideration of this request is greatly appreciated.

Finally, Judge Zainey I ask that you search your heart for the best determination in this matter. You have the opportunity to keep a happy family together and to promote the good works Ronald has been doing since he was 13 years old. As he matured, he didn't change. He challenged himself to become better and found

ways to do more. I pray the combination of your wisdom and compassion will guide you to decide for the greater good. Please decide against Ronald's incarceration. Thank you.

Respectfully and sincerely,

Ronald S. Markham, Sr., and the Markham Family:
Miranda, Ronald III, Ethan
Ronald Sr., Marlin
Renee D. Markham
Russell D. Markham
Elaine M. Markham
Melanie L. Markham
Michael Markham
Ginger Markham
Jack S. Markham

October 11, 2021

The Honorable Jay C. Zainey
United States District Court
500 Poydras Street
Room C455
New Orleans, LA 70130

RE:   CHARACTER REFERENCE FOR RONALD MARKHAM

Dear Honorable Jay C. Zainey,

My name is Warner Williams, and I am proud to offer my support for Ronald Markham, whom I have personally known for over 7 years as my friend.

I was introduced to Ronald Markham while serving as the Vice President of Chevron North America Exploration and Production Company's Gulf of Mexico business unit. At that time, Chevron was actively supporting STEM and Arts programs throughout Louisiana. As a forerunner in acknowledging the connection between STEM and Arts, Chevron coined the acronym STEAM Science Technology Engineering Arts and Math.

In 2014, Ronald's business partner, Irvin Mayfield, solicited a corporate sponsorship from Chevron in support of The New Orleans Jazz Orchestra (NOJO). Prior to forging any type of relationship with a non-profit organization, Chevron's Public Affairs organization engages in a well-established, thorough vetting process. The process assesses Board and leadership credibility, financial capabilities, tangible contributions made to the community, donor engagement and most importantly strategic fit. Upon clearing the vetting process, the General Manager of Public Affairs provides the Vice President of Chevron with a recommendation for approval.

As the Vice President of Chevron at that time, I met with Irvin Mayfield and Ronald Markham to learn more about the organization and its leadership team. I was extremely impressed with Mayfield's creative ingenuity and Markham's attention to detail and project management expertise. Their complimentary traits served as an asset to their artistic and entrepreneurial endeavors. As a musician and engineer, Ronald Markham exemplified the powerful connection between arts and science. Under the exemplary leadership of Ronald Markham, Chevron assuredly extended support to NOJO.

In late 2014, I retired from Chevron before the recommendation to support NOJO was brought forth, however it was approved by my successor, Mike Illane. Impressed with the financing structure and project management processes deployed in the New Orleans Jazz Market's construction, my wife, Pamela Williams, and I made a personal contribution of $360,000 (over 4 years) for naming rights of the main stage of the newly constructed venue. We embrace the NOJM's mission and do not regret our contribution. Further, we believe that Mayfield and Markham have much to offer the New Orleans community. Sending these men, who are also fathers, to jail would

be a waste of resources and would deprive the community of fathers and mentors that our children so badly need.

For the past 30 years, I have voluntarily served as a mentor for young black men. I became aware of Markham's personal and civic contributions to the community upon engaging with him in a mentorship capacity. I understand and acknowledge that Markham has pleaded guilty. During the time that I've known him, which includes the time charged in the indictment, he also pioneered successful fundraising campaigns for the New Orleans Public Library Foundation and invested a significant amount of personal time reviving the Public Library system in New Orleans after Hurricane Katrina.

Mr. Markham has proven to not only be a seasoned artisan, but also a person of strong moral character. I served on the New Orleans Jazz Orchestra's Board of Directors from 2015 – 2020. Ronald was President and CEO of the organization until 2017. During that time, I found Ronald to be honest, forthcoming, and approachable. I never felt misled about the source of NOJO's funding, or the state of its finances. Like many non-profits, NOJO operated on thin margins and relied on donor support. Ronald was integral in the revitalization efforts to improve the central city neighborhood in New Orleans and displayed an unwavering commitment to providing resources to its inhabitants. With a strong familial tie to the neighborhood, Markham felt a responsibility to give back to the community that nurtured and raised him. Ronald was a key figure in the development of the New Orleans Jazz Market, located in the historic arts and culture community of Central City on Oretha Castle Haley Boulevard. The mission New Orleans Jazz Market was to strengthen the legacy of Jazz, inspire authentic community engagement, and provide educational resources. Moving forward in his mission, Ronald instituted free youth and adult music educations lessons and made the venue available for use by local non-profit organizations.

During my relationship with Ronald Markham, I have experienced an individual who shows up earlier than asked, works hard and carries himself in a polite and respectful manner. In addition, Ronald Markham is a family-centered person who has always presented himself with level-headedness and grace. Unfortunately, in majority of Black families today fathers are absent and the responsibility to raise boys to become responsible and contributing citizens has been left to mothers. Ronald plays a central role in raising his two sons and is a committed father and husband. With confidence, I support Ronald Markham as someone that I truly believe possesses sound character and whose efforts continue to work for the betterment of our community. Incarceration would be tragic for his family and for the community.

Please do not hesitate to contact me if you should require any further information.

Sincerely,

Signature _____ Date: Oct 11, 2021

Warner Williams

July 8, 2021

The Honorable Jay C. Zainey

United States District Court

500 Poydras Street

Room C455

New Orleans, LA 70130

Honorable Jay C. Zainey:

My name is Richard Monteilh and I served as the Director of Capital Markets for the New Orleans Redevelopment Authority (NORA) from January 2008 through January 2009; and was appointed the NORA Interim Executive Director from January 2009 through January 2010.

Central City in New Orleans was a very decimated area of blight and abandoned buildings after Hurricane Katrina.

No developers or banks were willing to invest in this area.

To get a footing in the area we needed bold pioneers to take the risk of investment to jump start revitalization.

Our Authority (NORA) moved it's offices from downtown to Central City on Oretha C. Haley Boulevard and joint ventured with a developer to build 100 units of Senior Housing together with our building.

I asked Ron Markham if he would take on the old abandoned store on the Boulevard and convert it into a jazz venue to create a vibe that would bring traffic to the Boulevard.

Ron put together a development team and he personally laid out a financing plan that was complex and challenging. I traveled with him to sell this idea to the Prudential Insurance Co., Goldman Sachs, the Ford Foundation and smaller philanthropic groups. He used a process of stacking various Federal, State, and City tax credits, including historic and theater credits that were converted to cash for construction.

I found Ron to be a very intelligent man, who gave 100% of his time and efforts to this endeavor. Ron is a diligent and hard worker. He is an asset to New Orleans.

We need him out here where his talents can be used to help the many non-profits struggling to make a difference to the lives of ordinary people.

Look at Oretha C. Haley Boulevard today with numerous restaurants, groceries, and museums and you'll see what a difference a few people can make.

My plea to you Honorable Judge is that you allow Ron to use his talents to help our beloved New Orleans reach its better days.

Sincerely,

Richard Monteilh



July 1, 2021

The Honorable Jay C. Zainey
United States District Court
500 Poydras Street
Room C455
New Orleans, LA 70130

I am the Artistic Director of L.E.D.T. (Lula Elzy New Orleans Dance Theatre) and have known Ronald Markham for nearly 30 years — first as a student in pursuit of a career in the arts and later as a professonal musician.

Through all the years, I have found Ronald to be hardworking and compassionate about his artistry. Always upbeat and optimistic, he is a caring humble man who has worked tirelessly to share his knowledge, and bring about a change for his community and its environment.

When our organization called upon Ronald for many arts-in-education programs and L.E.D.T. company performances, our requests were always answered with a "Yes, count on me!" Not only did he volunteer his time as a musician, arranger, composer, he took the time to mentor kids along the way. And I should note that on each and every occasion with our concerts through the years, he never once allowed me to pay any compensation. He always told me that it was his gift of giving back to the arts, giving back to the community.

I can only end this by saying, I am really concerned about how devastating it would be for him, his young family and our community if there were to be any imprisonment. I hope you will take into consideration the good work he has done through the years, his dedication, his contribution to the art community and his desire to better himself as he pursues his life as a musician representing part of the soul of the City of New Orleans.

Sincerely,

*Lula Elzy*

Lula Elzy
L.E.D.T.

LULA ELZY NEW ORLEANS DANCE THEATRE

# To Whom It May Concern,

I am a songwriter and music producer. I co-wrote Ive Had the Time of my Life from Dirty Dancing for which I won an Academy Award.

Ive known Ronald Markham for almost ten years. We met at a mutual friend's house. He was there to help figure out the best place to put a piano. We instantly connected talking about music, our wives- who are both highly accomplished in their fields and also have a lot in common- and our kids. We've been to family gatherings together as well as work together. I consider Ron like a younger brother who is far more talented and brilliant a man as I could only dream of being.

For 5 years I produced the Crimestopper's Fundraising gala to honor the city's police. I wrote and produced a song to honor fallen police officers. Ron was right there next to me playing keyboards for the recording and video- which he donated his time and amazing talent which brought the music to life. He is the best musician and most professional musician I know. Every time I work with him I learn something. Every time I see him I get the greatest hug you can get!

Ronald doesn't "hang out". If he's not working, he's home with his family. Its hard enough to get him to meet for lunch.
Imprisonment would destroy a wonderful family-not just Ronald but his two amazing kids. It would crush his wife Miranda. Ronald has so much to offer to the community as well as playing music. He's got an engineering degree and is truly a gifted businessman who is here to help our city grow.

As a professional in the entertainment industry in NYC Los Angeles and New Orleans for 40 years I cant imagine taking Ron's freedom away. He is so young and has his whole life ahead of him-he is a brilliant man and I love him very much. He's never been in trouble before. He is one of the hidden treasures of New Orleans. There aren't many like him. He's in the prime of his musical career and life, what a waste it would be to see all that love he gives on a shelf.

Sincerely,

DONALD MARKOWITZ

July 9th, 2021

Re: Mr. Ronald Markham

To: The Honorable Jay C. Zainey
    United States District Court
    500 Poydras Street
    Room C455
    New Orleans, LA 70130

I am a licensed mental health counselor in New Orleans and have been a friend of Ronald Markham for over five years. My husband and I met Ronald through mutual friends and quickly developed a strong friendship on a personal and professional level.

Provided our close friendship, I am writing this letter to extend evidence of Ronald's character. I have witnessed many kind and compassionate actions by Ronald. My husband, Andrew Sheehy, has asked Ronald on numerous occasions to donate his time and musical talent on his local film projects. One specific example of Ronald's generosity that stands out is when my husband put on a stunt film clinic in New Orleans. Ronald gladly extended his talent and social influence to assist in the clinic and was willing to do so for the positive impact on our city.

Ronald consistently contributes to the community through being a strong father, husband, and a positive musician role model. Imprisonment would be tragic to everyone around him.

I sincerely ask for character reflection when deciding Ronald's future. Please consider, not only all his past contributions, but what he can do for New Orleans instead of imprisonment.

Kindly,

Wendy Lastrapes

 Gmail

Sara A. Johnson <sara@sarajohnsonlaw.com>

**Letter on behalf of Ronald Markham**

Wed, Jul 7, 2021 at 4:41 PM

To: sara@sarajohnsonlaw.com

The Honorable Jay C. Zainey
United States District Court
500 Poydras Street
Room C455
New Orleans, Louisiana 70130

Dear Judge Zainey,

I am the presiding bishop at Watson Memorial Teaching Ministries Church located at 4400 St. Charles Avenue. This letter is on behalf of Ronald Markham. I met Ronald when he was a very young musician and hired him to play piano and organ at my church in the early 1990s as I was just getting started as a young minister in our great city. He was a very smart and creative young musician with a very excellent skill set that enhanced our overall music department and church. He was very dedicated and committed to teaching and training voices. His attitude was always pleasant and positive. He became one of the best musicians I've hired in my thirty two years of pastoring.

It is my hope that he would not have to serve time in prison as this would be devastating to his family and and a great loss to our community. I have observed him as an asset to our community as we both served on the Audubon Institute for several years together. His volunteer time of service with Audubon was very valuable as he contributed ideas and support to the organization and community.

I'm asking for your compassion as he faces sentencing such that he can remain in the community and continue the great work he has been doing for many years. Ronald is an asset to so many other musicians, organizations and churches in our city. His gifts and talents are invaluable. He is committed to his lovely family and I believe he will continue to serve our community without expecting anything in return.

Sincerely,

Bishop Tom Watson
Senior Pastor


Sent from my iPad